THE STATE OF OHIO, APPELLEE, *v.* BENNER, APPELLANT.

[Cite as State *v.* Benner (1988), 40 Ohio St. 3d 301.]

(No. 87-1614—Submitted September 27, 1988—Decided December 30, 1988.)

*Lynn C. Slaby,* prosecuting attorney, and *Marc R. Wolff,* for appellee.

*Randall M. Dana,* public defender, *Randall L. Porter, Jane P. Perry* and *Kathleen A. McGarry,* for appellant.

SWEENEY, J. Pursuant to R.C. 2929.05(A), this court is duty-bound to undertake a three-prong analysis in reviewing the instant death penalty case. First, we will consider the specific issues raised by appellant with respect to the proceedings below. We will review all of appellant's propositions of law even though some may be deemed to have been waived since they were not raised below. Second, we will independently weigh the aggravating circumstances in this case against any and all factors which mitigate against the imposition of the death sentence. Third, we will independently consider whether appellant's sentence is disproportionate to the penalty imposed in similar cases.

In his first proposition of law, appellant argues that the course-of-conduct provision set forth in R.C. 2929.04(A)(5) is void for vagueness, both facially and as applied.

Under R.C. 2929.04(A)(5), one who commits aggravated murder is eligible for the death penalty where:

"Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."

It is axiomatic that all statutes enacted by the General Assembly enjoy a strong presumption of validity. See, *e.g., State* v. *Meadows* (1986), 28 Ohio St. 3d 43, 51-52, 28 OBR 146, 153, 503 N.E. 2d 697, 704.

Appellant contends that the Committee Comment to R.C. 2929.04 explains this provision as dealing with "repeat murder or mass murder[.]" Because the phrase "mass murder" in the Committee Comment and the course-of-conduct provision in the subsection are both placed after the word "or," appellant submits that "mass murder" was intended to define the phrase "course of conduct involving the purposeful killing of or attempt to kill two or more persons * * *." Appellant argues that "mass murder" traditionally means the commission of more than one murder in the same transaction.

Upon a careful review of this statutory section, we find that appellant's definition of "mass murder" in this context is unduly narrow. In our view, it would be incongruous to define the R.C. 2929.04(A)(5) specification as including, under the first prong, a defendant who kills two or more people at different times but only if he has been convicted of one of those killings, while including, under the course-of-

conduct provision, *all* those who kill two or more simultaneously even if they have not previously been convicted of any of those killings.

In *State* v. *Beuke* (1988), 38 Ohio St. 3d 29, 526 N.E. 2d 274, the defendant committed one aggravated murder and two attempted aggravated murders, each in a separate incident. In affirming the convictions of defendant, this court held that a course-of-conduct specification was supported by the evidence. *Id.* at 43, 526 N.E. 2d at 288.

We believe that if appellant's vagueness argument is based on the possibility of differing interpretations of the term "course of conduct," it is misdirected since such a possibility is not the correct test for vagueness in capital cases. "Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman* v. *Georgia* * * *." *Maynard* v. *Cartwright* (1988), 486 U.S. ___, ___, 100 L. Ed. 2d 372, 380, 108A S. Ct. 1853, 1858.

The R.C. 2929.04(A)(5) course-of-conduct specification is not the type of "open-ended" statute struck down in *Maynard, supra,* and *Godfrey* v. *Georgia* (1980), 446 U.S. 420. In *Godfrey,* the court found that an aggravating circumstance for murders that were "outrageously or wantonly vile, horrible or inhuman" did not adequately channel jury discretion: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible or inhuman.'" *Id.* at 428-429. Similarly, in *Maynard,* the court struck down an aggravating circumstance provision referring to "especially heinous, atrocious or cruel" murders, on the basis that "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" 486 U.S. at ___, 100 L. Ed. 2d at 382, 108A S. Ct. at 1859.

Turning to the statute assailed *sub judice,* it is clear that no one could reasonably believe that every murder is "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." Thus, we find that the specification in R.C. 2929.04(A)(5) does not give the sentencing court the wide discretion condemned in both *Godfrey* and *Maynard.* Therefore, we hold that the course-of-conduct specification is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution. The language of the statute is definitive and is circumscribed to cover only those situations which it fairly describes. Accordingly, we find appellant's first proposition of law to be without merit.

In appellant's second proposition of law, he asserts that the charges stemming from four separate incidents as set forth in the indictments were improperly joined in one trial in contravention of Crim. R. 14.

This court has held that a defendant who asserts that joinder is improper must show prejudice. *State* v. *Roberts* (1980), 62 Ohio St. 2d 170, 175, 16 O.O. 3d 201, 204, 405 N.E. 2d 247, 251. Appellant raises two allegations of prejudice. First, he maintains that he was prejudiced by the "risk that the trier of fact will cumulate the evidence and convict a defendant of an offense when he would not have been convicted had the evidence been segregated."

However, this court has held that "[w]here evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of a criminal disposition is largely absent." *State* v. *Hamblin* (1988), 37 Ohio St. 3d 153, 159, 524 N.E. 2d 476, 481-482. Thus, in *State* v. *Martin* (1985), 19 Ohio St. 3d 122, 19 OBR 330, 483 N.E. 2d 1157, we held that an aggravated robbery count involving the theft of a gun need not be severed from an aggravated murder count, where the stolen gun was the murder weapon. The evidence of the theft tended to show the defendant's possession of the murder weapon, and thus would have been admissible in the murder trial even had the counts been severed. *Id.* at 127, 19 OBR at 334, 483 N.E. 2d at 1162.

In the instant cause, had the trial been severed into four proceedings, the evidence of all the offenses would have been admissible in each trial. Under Evid. R. 404(B), evidence of other crimes is admissible to prove identity. In the cause *sub judice,* four rapes were committed or attempted. According to the state's theory of the case, all four crimes ended with a strangulation or attempted strangulation of the victim. In two cases, the victim's own brassiere was used as a ligature. In Cynthia Sedgwick's case, the bra was used to tie her hands. Cf. *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124, 127-128, 60 O.O. 2d 95, 97, 285 N.E. 2d 726, 730. Moreover, each strangulation or attempted strangulation was relevant to the course-of-conduct specification, R.C. 2929.04 (A)(5), that accompanied the Sedgwick and Bowser murders.

Moreover, "the jury is capable of segregating the proof of multiple charges when * * * the evidence of each crime is uncomplicated." *Hamblin, supra.* The offenses in the instant case were committed in four distinct incidents, and the evidence here does not appear complicated.

Second, appellant argues that he was prejudiced because the joinder influenced his decision on whether to testify. Appellant intimates that he was deterred from giving alibi testimony in the Powell case because the contrast between his testifying on that and his silence on the other three might have caused the court to infer guilt from his silence. Nevertheless, this court has previously rejected this argument as "insubstantial and speculative * * *." *State* v. *Torres* (1981), 66 Ohio St. 2d 340, 344, 20 O.O. 3d 313, 315, 421 N.E. 2d 1288, 1291; cf. *Roberts, supra.*

Based on the foregoing, we find that appellant has shown no prejudice resulting from joinder. Therefore, the trial court did not abuse its discretion in denying severance, and we find appellant's second proposition of law to be without merit.

In his third proposition of law, appellant asserts that an aggravating circumstance cannot duplicate an element of the underlying offense. However, as appellant concedes in his reply brief, the recent opinion in *Lowenfield* v. *Phelps* (1988), 484 U.S. ___, 98 L. Ed. 2d 568, 108 S. Ct. 546, finds no constitutional bar to such a practice.

Nevertheless, appellant maintains that such a practice violates Section 9, Article I of the Ohio Constitution (outlawing "cruel and unusual punishments") by failing to narrow the class of murderers who can receive the death penalty.

In *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 178, 15 OBR 311, 323, 473 N.E. 2d 264, 280, this court rejected this argument. Moreover, we reaffirm our prior observation that the ag-

gravating circumstances of R.C. 2929.04(A)(7) and the elements of aggravated murder under R.C. 2903.01 (B) are not duplicative. *Id.* at 177, 15 OBR at 322-323, 473 N.E. 2d at 380, fn. 17.

Accordingly, we find appellant's third proposition of law to be not well-taken.

In his fourth proposition of law, appellant argues that the warrants authorizing the search of his houses and his truck for "fibers and hairs and other trace evidence for comparison" did not specifically identify the items to be seized, and were therefore invalid.[1] Appellant further contends that even if the warrants issued were indeed valid, certain items not described therein could not be properly seized under the "plain view" doctrine.

In search and seizure cases where a warrant is involved, the requisite specificity necessary therein usually varies with the nature of the items to be seized. Where, as here, the items are evidence or instrumentalities of a crime, it appears that the key inquiry is whether the warrants could reasonably have described the items more precisely than they did. See LaFave, Search and Seizure: A Treatise on the Fourth Amendment (1978) 104-105, Section 4.6(d).

In the instant cause, it would have been extremely difficult for the police to precisely describe all potential sources of hair or fiber evidence as appellant suggests they should have. Until the searches took place, the officers could not precisely know what particular items would yield hairs or fibers.

Clearly, the language of a warrant cannot sanction a general exploratory search. However, we believe that the "fibers and hairs" language used in the subject warrants placed a meaningful restriction on the executing officers, *viz.*, they could only seize those items that could be sources of fibers and hairs. While the "fibers and hairs" clause in the warrants was undoubtedly broad, we believe that it did not permit the officers to simply take any item they wanted.

While the "other trace evidence for comparison" language of the warrants is also very broad, such a catchall phrase does not necessarily invalidate a warrant especially when accompanied by an enumeration of specific items within the general category. See *Andresen* v. *Maryland* (1976), 427 U.S. 463, 479-481. Such a list "provide[s] guidelines for the officers conducting the search." *State* v. *Lingo* (1982), 32 Wash. App. 638, 642, 649 P. 2d 130, 133. In the cause *sub judice*, the catchall portion of the clause was limited by the specific mention of hairs and fibers. As such, we find that it does not invalidate the warrants.

With regard to the evidence that was not described in the warrants, the state argues that such items were validly seized under the plain view doctrine.

In order to justify the seizure of an item under the plain view doctrine, the initial intrusion leading to the discovery of the items must be lawful; it must

---

[1] The search warrant for appellant's Broadview Road residence and his truck described various items of property to be seized, including:

"Fibers and hairs and other trace evidence for comparison * * * which is evidence of violations of Ohio Revised Code Sections 2905.01(A) and 2903.01 * * *."

The search warrant for appellant's Butterbridge Road residence used nearly identical language.

be immediately apparent to the executing officers that the items are incriminating; and the discovery of the items must have been inadvertent. *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443, 466-469. See, also, *State* v. *Williams* (1978), 55 Ohio St. 2d 82, 9 O.O. 3d 81, 377 N.E. 2d 1013, paragraph one of the syllabus.

For the purposes of the plain view doctrine, discovery of evidence is inadvertent if the police lacked probable cause to believe the evidence was at the location searched when they applied for the search warrant. See *United States* v. *Hare* (C.A. 6, 1979), 589 F. 2d 1291. This is so because if the police truly lacked probable cause as to a particular item, they cannot be expected to obtain a warrant to search for it. Hence, they should not be penalized for failing to obtain a warrant. If, on the other hand, probable cause does exist to seek a particular item, the language articulating such probable cause should be set forth in the affidavit and the item should be included in the search warrant. Where such probable cause exists, the seizure of the item, not described in the warrant, may not be justified under the plain view doctrine. *Id.* at 1294-1295.

Detective Sergeant Richard Osborne, who executed the warrant, testified that he was told by an Akron detective that a bottle of pennies had been taken from Nancy Hale at the time of her attack.

It appears that Osborne's only basis of knowledge that the bottle was linked to the Hale case was what he was told by the Akron officer. Had Osborne been investigating the Hale case, and if the Akron officer had probable cause to believe that the bottle was in appellant's house, Osborne would be charged with knowledge of the facts creating probable cause, for "* * * the existence of probable cause is to be evaluated on the basis of the collective information of the law enforcement officers engaged in a particular investigation." *United States* v. *One 1975 Pontiac LeMans* (C.A. 1, 1980), 621 F. 2d 444, 449.

However, Osborne was investigating the Powell and Bowser cases, not the Hale case. Since Osborne said that the bottle had no evidentiary value "to my particular case," the Akron officer's knowledge should not be attributed to him. Osborne could not have justified obtaining a warrant on the basis of what an unnamed officer, investigating a different case, told him without saying how he knew. Thus, in our view, Osborne found the bottle "inadvertently" within the meaning of *Coolidge.*

Even assuming that the bottle was illegally seized, its admission was harmless, since appellant confessed to raping Hale, and Tyson testified that he saw appellant do it. Under such circumstances, the bottle was clearly not a vital piece of evidence.

Osborne also seized a roll of masking tape as evidence in the Powell assault which he was investigating. He knew that masking tape had been used in the attack and that Powell had identified appellant as the attacker. We are of the opinion that a reasonable person could have believed that similar tape would be found in appellant's home or vehicle and, therefore, it appears that Osborne had probable cause to search for the tape. Thus, its discovery was not inadvertent and it should have been suppressed.

However, we also believe that this error was harmless. Powell positively identified appellant as her assailant. Moreover, the roll of tape found at the Butterbridge house was apparently not the same tape used on Powell, since police found another roll near East Howe Road less than three and a

half hours after the attack. Thus, it appears, beyond a reasonable doubt, that the illegally seized roll of tape was not crucial to appellant's conviction. Appellant would have been convicted on the Powell charges regardless of the admission of this improperly seized evidence.

As for the paint chip allegedly seized under the plain view doctrine, we believe that if the police had probable cause to search for hairs and fibers to compare to those found on Trina Bowser's legs, they also had probable cause to search for paint samples or chips similar to the one found on Bowser's coat. Thus, it appears that the discovery of the matching paint chip found in appellant's vacuum bag could not have been inadvertent. However, the admission of the paint chip is harmless given the strength of the fiber evidence.

In sum, we find that since the search warrants were valid, the fibers seized thereunder were properly admitted before the trial court. While we find that the roll of masking tape should have been suppressed, we believe that the admission of such evidence was harmless beyond a reasonable doubt. *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 2 O.O. 3d 249, 357 N.E. 2d 1035, paragraph seven of the syllabus. However, with respect to the bottle of pennies, we find that it was admissible under the plain view doctrine. For these reasons, we overrule appellant's fourth proposition of law.

In appellant's fifth proposition of law, he asserts that he effectively invoked his Fifth Amendment right to counsel when Akron police told him that his father had hired a lawyer for him, and he did not indicate that he did not want one. Appellant maintains that his subjection to custodial questioning after this implied invocation violated

*Edwards* v. *Arizona* (1981), 451 U.S. 477.

After appellant was arrested by Akron police for raping Nancy Hale, he was taken to the Akron police station where Lieutenant Frank Stemple and Detective Lynn F. Hillegas questioned him about the rape. Most of this interrogation was recorded, and the tape was introduced as state's exhibit three. During the questioning, an attorney named Jim Burdon telephoned the station and asked Stemple to not "have any more conversations with him." Stemple then returned to the interrogation room and told Hillegas that appellant's family had called Burdon and that Burdon had requested that the interrogation end.

Osborne and Lieutenant Larry Momchilov of the Summit County Sheriff's Department were also at the police station at that time. When the Akron detectives ceased the interrogation, Osborne and Momchilov entered the interrogation room. Although they knew of Burdon's call, they thought it applied only to the questioning by Akron officers about the Hale rape, and so they began to question appellant regarding the Sedgwick murder. After "a few minutes" of conversation, Burdon arrived and told Osborne and Momchilov "that he did not want * * * [them] to talk to his client any further." As a result, the two left the room. Burdon then went into the interrogation room with appellant, and upon coming out, he stated: "I would request that he not be questioned anymore, that you just take him down and book him."

On January 12, Osborne and Momchilov arrested appellant for the attempted murder of Shelli Powell. They moved him from the Summit County Jail, where he was being held, to the Tallmadge police station, where they

booked him. They recited his *Miranda* rights and interrogated him again.

The officers showed appellant a list of ten names and asked whether he had ever gone to the Blossom Music Center with any of those people. According to Osborne, after discussing the list, appellant "made some comment to the * * * [effect] that 'I don't wish to talk with you anymore' or 'without my attorney' * * *." At some point, Osborne asked appellant "if he was responsible for the homicide and/or the attempted homicide * * *." Appellant denied it. It is unclear whether this colloquy came before or after appellant expressed his desire to stop talking; however, it was not used at trial.

Although appellant did not affirmatively invoke his right to counsel before January 12, he argues that when he was informed of Burdon's request and "expressed no desire to continue with his confession," he thereby invoked his right to counsel. If that is correct, then Osborne and Momchilov acted illegally. Under *Edwards, supra,* police may not initiate interrogation of a suspect in custody who has invoked his Fifth Amendment right to counsel. See, also, *Arizona* v. *Roberson* (1988), 486 U.S. ___, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

The state argues that since adversarial judicial proceedings had not yet commenced on the date of appellant's interrogation, appellant's right to counsel had not attached. However, the commencement of adversarial proceedings is relevant only to the Sixth Amendment right to counsel; the Fifth Amendment right to counsel attaches whenever an accused is subjected to custodial interrogation. See *Miranda* v. *Arizona* (1966), 384 U.S. 436, 477.

However, we find that appellant did not invoke his right to counsel. Appellant's contention that he invoked that right by not repudiating it seems inconsistent with the language of *Edwards. Edwards* held that "an accused * * *, having *expressed* his desire to deal with the police only through counsel, is not subject to further interrogation * * *." (Emphasis added.) 451 U.S. at 484-485. The rule operates where the accused "*has clearly asserted* his right to counsel." (Emphasis added.) *Id.* at 485.

*Miranda* contains language suggesting the need for an explicit assertion of the right: "If the individual *states* that he wants an attorney, the interrogation must cease until an attorney is present." (Emphasis added.) *Miranda, supra,* at 474. Apparently relying on this language, a federal court has held that an accused "* * * must actually articulate his request for an attorney * * *." *United States* v. *Pearson* (C.A. 11, 1984), 746 F. 2d 787, 793.

In view of the language of *Miranda* and *Edwards,* appellant's inaction is not enough to invoke the right to counsel. Inasmuch as appellant did not affirmatively articulate a request for counsel, we find that there was no invocation of that constitutional right.

Additionally, it cannot be said that Burdon invoked appellant's right since the Fifth Amendment right against compulsory self-incrimination is a personal right "that can only be invoked by the individual whose testimony is being compelled." *Moran* v. *Burbine* (1986), 475 U.S. 412, 433, fn. 4. See, also, *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 278, 528 N.E. 2d 542, 547, quoting *State* v. *Carder* (1966), 9 Ohio St. 2d 1, 7, 38 O.O. 2d 1, 4, 222 N.E. 2d 620, 625.

Had appellant expressed to Burdon a desire not to be questioned outside the presence of counsel, using Burdon to communicate that desire to the police, a valid invocation of ap-

pellant's right may have been accomplished since it would have been an expression of appellant's own will. Nevertheless, that does not appear to have occurred here. After seeing appellant, Burdon renewed his request that the interrogation cease. However, he did not indicate that he was relaying appellant's instructions. He said, "I would request that he not be questioned * * *." This statement appears to be an attempt by Burdon to invoke appellant's right for him. Cf. *Commonwealth* v. *Currie* (1983), 388 Mass. 776, 780-784, 448 N.E. 2d 740, 744-745.

Based on the foregoing, we find appellant's fifth proposition of law to be without merit.

In his sixth proposition of law, appellant contends that the trial court erred in admitting gruesome photographs of the Sedgwick and Bowser crime scenes.

In *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, paragraph seven of the syllabus, this court set forth the test concerning the introduction of gruesome photographs in capital cases as follows:

"Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, *as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.*"[2] (Emphasis added.)

See, also, *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 513 N.E. 2d 267; *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 514 N.E. 2d 394; *State* v. *DePew, supra.*

Although many of the photographs at issue are undeniably gruesome, we find that their probative value outweighs their prejudicial effect.[3] While some of the photographs should per-

---

[2] It should be pointed out that *Maurer* sets forth a stricter standard for the admission of gruesome photographs in a capital case than the usual Evid. R. 403 standard. *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 258, 513 N.E. 2d 267, 273-274. Such a stricter standard is justified in capital cases because gruesome photographs which depict the victim of the offense are charged with such immediacy and emotional impact that the risk of prejudice is enhanced proportionately, a risk that we are less willing to tolerate in a case where the defendant faces a penalty of death.

[3] The Sedgwick photographs show the extent of the body's decomposition and extreme maggot infestation of the head and neck; while this is unsettling, the photographs tend to show that violence was used on Sedgwick, since, as the coroner testified, maggots tend to concentrate on areas of tissue damage. The photographs establish the element of force necessary to prove kid-

napping and rape in this case; moreover, they corroborate Robert Tyson's testimony that appellant admitted to striking, raping, and killing Sedgwick. The advanced state of decomposition and the resultant scarcity of soft tissue were also relevant to explain why the coroner was unable to make a more definitive analysis.

The Bowser photographs are less prejudicial (since her body was not decomposed) and equally probative. They illustrate the coroner's testimony about the marks on Bowser's throat and show how those marks got there. They show the edematous fluid around her nose and the facial discoloration consistent with strangulation. Exhibit 72 shows the cord used to tie her feet.

However, both sets of photographs were repetitive. State's Exhibits 27 and 116 both show Sedgwick's blackened and maggot-infested head. Exhibits 118 and 120 both show the head, after cleaning, with the skull partly exposed. While taken

haps have been excluded, only a few of these were very gruesome. The record indicates that the prosecutor did not allude to the pictures in either closing argument, cf. *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 14-15, 514 N.E. 2d 407, 420, and did not commit error in any manner comparable to that of the prosecutor in *Thompson.* While the prosecutor may have erred in appealing to the court's sympathy for the families of the victims, that error is not comparable to the *Thompson* errors in "type and magnitude." *Id.* at 15, 514 N.E. 2d at 421.

Because of the overwhelming evidence of appellant's guilt, the erroneous admission of repetitive photographs was harmless beyond a reasonable doubt in the guilt phase. It should be underscored that this cause was decided by a three-judge panel and not a jury, which fortifies our finding

that any error in this regard was harmless. Additionally, since this case does not present a combination of errors so egregious as to deny a fair trial in the penalty phase, the error indicated was also harmless in the penalty phase as well.

For these reasons, appellant's sixth proposition of law is not well-taken.

Appellant's seventh proposition of law is a variation of the sixth since he contends that the coroner's testimony was cumulative and gruesome. Appellant argues that the testimony on the decomposition and maggot infestation of Sedgwick's body was offensive and unjustified.

We believe that, unlike gruesome photographs, testimony alleged to be gruesome should not be subjected to the *Maurer* standard. Instead, the standard applicable to gruesome testi-

---

from different angles, neither seems to show any relevant fact not shown by the other. See *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 9, 514 N.E. 2d 407, 416. In our opinion, one of each pair should have probably been excluded.

Exhibits 25 and 26 show the body, including the decomposed and maggot-infested vaginal area. While these photographs are perhaps the most horrifying of the lot, we do not believe that they are repetitive. Exhibit 25 shows a white "jelly" shoe near the right foot. Exhibit 26 is a closer view of the same subject, but does not show the jelly shoe. The jelly shoe tends to identify the body as Sedgwick's, because she was wearing jelly shoes when last seen. The shoe cannot be seen in Exhibit 26. Exhibit 26, however, depicts rings on Sedgwick's right hand that cannot be seen in Exhibit 25. Sedgwick was wearing silver rings when last seen.

Both the shoe in Exhibit 25 and the rings in Exhibit 26 are relevant for the same purpose, *i.e.,* to identify the body as Sedgwick's and, therefore, the photographs are arguably cumulative. However, when

considering the extreme deterioration of the body, it does not seem unduly cumulative to use both pictures to prove that it was Sedgwick's.

Exhibits 24 and 28 both show the body's discolored left hand and muddy leg. Exhibit 28 shows a pack of Winston cigarettes, which was appellant's brand, and a silver-colored bracelet designated State's Exhibit 15, and identified as looking like one belonging to Sedgwick. Exhibit 24 shows the knotted bra, but that is also shown in Exhibits 29 and 30. Exhibit 24 should probably have been excluded; however, it is not markedly gruesome. The same can be said for Exhibit 30. While it shows nothing that cannot be seen in Exhibit 29, it is not highly disturbing.

Of the Bowser photographs, Exhibit 112 shows nothing not shown in Exhibits 76 and 78; however, in Exhibit 112 it is easier than in Exhibit 76 to see the contusions on Bowser's tongue. Exhibit 114 shows the neck marks from the bra that was twisted around Bowser's neck. Since it adds nothing to Exhibit 78, it should probably have been excluded.

mony is found in Evid. R. 403(A), *i.e.*, the testimony should be excluded only "* * * if its probative value is substantially outweighed by the danger of unfair prejudice * * *."

Upon a careful review of the coroner's testimony, we find that such testimony was not substantially more prejudicial than probative. The testimony regarding decomposition and maggot infestation was relevant not only because these conditions made definitive medical findings difficult, but also because they indicated violence and tissue damage to certain areas of Sedgwick's body. Hence, the coroner had to describe in detail the extent of decomposition, because the amount of decomposition in this case gave proof to the use of violence, since tissue already damaged decomposes more rapidly. The potential prejudice of this testimony was, in our view, slight.

Therefore, appellant's seventh proposition of law is without merit.

In his eighth proposition of law, appellant argues that the coroner's testimony on the cause and manner of Sedgwick's death was too uncertain to be competent and, therefore, should have been excluded. Specifically, appellant objects to the coroner's testimony which stated that "* * * the cause of death here was more than likely strangulation or asphyxia, and the manner of death, based upon subsequent information, was a homicide."

In this jurisdiction, an expert opinion is competent only if it is held to a reasonable degree of scientific certainty. See *State* v. *Holt* (1969), 17 Ohio St. 2d 81, 46 O.O. 2d 408, 246 N.E. 2d 365, syllabus. In this context, "reasonable certainty" means "probability." *Id.* In a recent case, this court equated "extremely likely" to the word "probable." *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 134, 22 OBR 203, 212, 489

N.E. 2d 795, 805. While our opinion in *Holt* stated that something that is "likely" is less certain than something that is "probable," *id.* at 85, 46 O.O. 2d at 411, 246 N.E. 2d at 368, we question the wisdom of that finding.

According to the Oxford English Dictionary, "probable" means "[h]aving an appearance of truth; that may in view of present evidence be reasonably expected to happen, or to prove true; likely." VIII Oxford English Dictionary (1933) 1401, definition 3. "Likely" is defined as follows: "Having an appearance of truth or fact; that looks as if it would * * * prove to be what is alleged or suggested; probable." VI Oxford English Dictionary (1933) 288, definition 2.

According to Black's Law Dictionary, "likelihood" means "[p]robability" and "imports something less than reasonably certain." Black's Law Dictionary (5 Ed. 1979) 834, citing *Clark* v. *Welch* (C.A. 1, 1944), 140 F. 2d 271, 273. "Likely" means "[p]robable" or "[i]n all probability." *Id.*, citing *Horning* v. *Gerlach* (1934), 139 Cal. App. 470, 34 P. 2d 504, 505. See, also, Webster's Third New International Dictionary (1971) 1310 and 1806.

Cases equating the terms "probable" and "likely" include *Robinson* v. *Argonaut Ins. Co.* (Tex. Civ. App. 1976), 534 S.W. 2d 953, 956; *Graham* v. *Joseph H. Bauland Co.* (1904), 97 App. Div. 141, 145-146, 89 N.Y. Supp. 595, 598; *Union Gold Mining Co.* v. *Crawford* (1902), 29 Colo. 511, 520, 69 P. 600, 603 ("likely" and "probable" synonymous; neither interchangeable with "reasonably certain," but difference too slight to warrant reversal); *Willard Oil Co.* v. *Riley* (1911), 29 Okla. 19, 22, 115 P. 1103, 1105; *Barrett* v. *Green River & Rock Springs Live Stock Co.* (1922), 28 Wyo. 379, 384, 205 P. 742, 743; *Hoy* v. *Tornich* (1926), 199 Cal. 545, 554, 250 P. 565,

569; *Pucci* v. *Rausch* (1971), 51 Wis. 2d 513, 519, 187 N.W. 2d 138, 142; *Nunez* v. *Wilson* (1973), 211 Kan. 443, 447, 507 P. 2d 329, 334; *Dallas* v. *Burlington Northern, Inc.* (Mont. 1984), 689 P. 2d 273, 277 ("more likely than not" expresses probability, not possibility).

In our view, the coroner's conclusions were not merely likely, but "more than likely," a phrase that falls somewhere between "likely" and "extremely likely," the latter of which was sanctioned in *Buell, supra.*

In any event, assuming, *arguendo,* that the admission of the coroner's opinion would be error under *Holt,* we find that it was harmless error beyond a reasonable doubt. The record indicates that Sedgwick's body was found in a secluded place, having suffered violence, six days after she was last seen. Even without the coroner's opinion, those facts supported a finding that Sedgwick was a homicide victim. Additionally, we have the testimony that appellant told Tyson that he had killed a woman at Blossom Music Center on the night that Sedgwick disappeared.

Although the coroner could not find physical evidence of strangulation, he was able to eliminate, within a reasonable medical certainty, all other causes of death. From this testimony, the court could have found that Sedgwick was strangled even had the coroner not directly said so.

Accordingly, we find no merit in appellant's eighth proposition of law.

In his ninth proposition of law, appellant asserts prosecutorial misconduct in both phases of his trial.

With respect to this alleged error, we believe that the only statements that arguably border on compelling a reversal were those where the prosecutor spoke of the grief of the victims' families. In a recent opinion, the United States Supreme Court ob-

served that the grief and loss felt by a victim's survivors are considered constitutionally irrelevant to the culpability of her killer. *Booth* v. *Maryland* (1987), 482 U.S. ___, ___, 96 L. Ed. 2d 440, 451, 107A S. Ct. 2529, 2535. However, this court has recently distinguished between a prosecutor's argument, presented "* * * in response to the photographic and testimonial evidence in mitigation" and "* * * the victim-impact statement in *Booth* which detailed the emotional trauma suffered by the family, the personal character and reputation of the victims; contained an assessment of the impact on the family; and included family members' opinions and characterizations of the crime — all of which were admissible against Booth in the sentencing phase of his trial." *Beuke, supra,* at 34, 526 N.E. 2d at 281. The prosecutor's argument here, as in *Beuke,* discussed the emotional trauma of the families, but not the victims' characters; nor did it cite the opinions of family members, Cf. *Beuke, supra,* at 47, 526 N.E. 2d at 292, fn. 4 (Wright, J., dissenting in part and concurring in part).

More significantly, we should point out again that the instant case was tried to a three-judge court, and not to a jury. This court has held that in a bench trial, the court is presumed to have considered only the relevant, competent, and material evidence before it. *State* v. *Post* (1987), 32 Ohio St. 3d 380, 384, 513 N.E. 2d 754, 759. In *Post,* a victim impact statement was admitted and the victim's son was allowed to address the court, both in violation of *Booth, supra.* Since, however, the instant case was tried to the court, as was *Post,* and the record does not affirmatively show that the court was influenced by the improperly admitted evidence, its admission constituted harmless error. In addition,

the court's sentencing opinion does not show that it was swayed by sympathy for the surviving family members. Therefore, since we are unable to find any hint of prejudicial error in the prosecutor's statements before the court that would compel a reversal, we overrule appellant's ninth proposition of law.

In his tenth proposition of law, appellant alleges ineffective assistance of counsel in both the guilt and penalty phases of his trial. In his fourteenth proposition of law, appellant claims ineffective assistance of counsel in his appeal before the court of appeals.

Appellant alleges that trial counsel failed to prepare for the mitigation hearing. He notes that counsel requested neither the presentence investigation nor the mental examination to which he is entitled under R.C. 2929.03(D)(1). However, the record reveals that trial counsel called as a witness Dr. James W. Siddall, a psychologist. Siddall testified that appellant suffered from "several different mental disorders" including episodic alcohol abuse, major depression, continuous cannabis abuse, and "mixed drug abuse, remission."

Appellant argues that his attorneys were ineffective because they called no witnesses to corroborate this diagnosis by testifying to appellant's substance abuse and short temper. In our opinion, this does not indicate, as appellant suggests, a complete failure to investigate appellant's background such as that which occurred in *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061. Nor does it demonstrate lack of preparation that would indicate that trial counsel had not decided, by the last day of the guilt phase, whether to request a presentence investigation or psychiatric examination. In sum, we cannot find any errors committed by counsel that

denied appellant the effective assistance of counsel he is guaranteed by the Sixth Amendment to the United States Constitution. See *Strickland* v. *Washington* (1984), 466 U.S. 668.

Appellant's allegations with respect to ineffective assistance of appellate counsel center on their failure to raise six issues in the court of appeals. The same six issues to which appellant refers are presented in his appeal before this court as his third, sixth, seventh, eighth, ninth and eleventh propositions of law. Since this court finds that none of these alleged errors constitutes reversible error, we do not believe that appellant was prejudiced by the failure of appellate counsel to raise such errors before the court of appeals.

Accordingly, we find appellant's tenth and fourteenth propositions of law to be not well-taken.

In his eleventh proposition of law, appellant argues that a conviction of aggravated murder under R.C. 2903.01(B) is contrary to law when there is insufficient evidence to prove the felony necessary to elevate the offense from murder to aggravated murder. Specifically, appellant contends that the state failed to prove that he raped or kidnapped Sedgwick.

In reviewing this alleged error, we note that Robert Tyson testified that, on the day after the Thorogood concert, appellant admitted to him that, the night before, "he raped * * * [a woman] and choked her to death." Since the victim's body was so badly decomposed, the coroner could not corroborate Tyson's testimony. By the same token, however, the coroner was unable to contradict Tyson's testimony.

Clearly, Tyson's credibility was a question for the trier of fact to determine. We find that Tyson's testimony permitted the trial court to find ap-

pellant guilty of rape, and therefore guilty of the R.C. 2929.04(A)(7) aggravating circumstance, beyond a reasonable doubt.

In addition, Tyson's testimony also indicated that appellant kidnapped Sedgwick. Tyson testified that appellant told him that "after the concert was over he [appellant] ran this girl into the woods and held her down there." Tyson further testified that appellant said that "he hit her in the throat a couple times * * *" and "he tied her hands with her bra."

Unlike Tyson's testimony on the rape, the foregoing testimony was corroborated. A knotted bra was found near the body. The coroner testified that the decomposition of the perineal area indicated tissue damage. Answering a hypothetical question based on Tyson's testimony, the coroner said that the facts stated in the hypothetical "explained an awful lot" of what he saw in his examination.

Assuming, *arguendo,* that rape was not proved, all the elements of kidnapping under R.C. 2905.01(A)(3) (kidnapping to terrorize or to inflict serious harm) and (4) (kidnapping to engage in sexual activity against the victim's will) were present. The testimony showed that appellant tied Sedgwick's hands and "held her down," thus restraining her of her liberty by force, and that he struck her about the throat. Tyson also testified that appellant said he put his hand inside her vagina, constituting sexual contact under R.C. 2907.01(B) and therefore sexual activity under R.C. 2907.01(C). The circumstances of forcible restraint and violence showed that the sexual activity was against her will. Hence, appellant's purpose to "engage in sexual activity * * * with the victim against * * * [her] will" was thereby shown. Moreover, the condition of Sedgwick's body, along with Tyson's testimony, showed a purpose to inflict serious physical harm on Sedgwick.

Appellant contends that under the circumstances here, kidnapping and rape are allied offenses of similar import. Therefore, he argues that the state had to prove that the kidnapping was not incidental to the rape. While his discussion of this issue is accurate, we do not believe it is relevant. Both Count Two of the indictment and its second specification charge "rape and/or kidnapping." Hence, if either rape or kidnapping was proved, both the charge and the specification would stand. Thus, although the kidnapping may have been merely incidental to the rape, the kidnapping issue would not matter unless rape or attempted rape was not proved. If the rape was not proved, however, the kidnapping could not be an allied offense of similar import to it.

Since we find that the evidence was sufficient to prove either rape or kidnapping, appellant's eleventh proposition of law is overruled.

In his twelfth proposition of law, appellant claims that the trial court weighed what appears to be a nonstatutory aggravating circumstance against him. Appellant submits that the sentencing opinion of the trial court indicates that the nature of the crimes committed was weighed as an aggravating circumstance.[4]

---

[4] In the sentencing opinion, the three-judge panel stated in relevant part:

"The Court did, however, consider as relevant to the aggravating circumstances the testimony and evidence relating to the brutal and depraved manner in which the Defendant strangled or attempted to strangle his victims, the frequency of his attacks, his seeming indifference and lack of remorse for the trail of death and broken

In *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 116-117, 31 OBR 273, 278, 509 N.E. 2d 383, 389-390; *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 512 N.E. 2d 598, paragraph one of the syllabus; *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 81, 512 N.E. 2d 611, 615; and *State* v. *Jester* (1987), 32 Ohio St. 3d 147, 153, 512 N.E. 2d 962, 969, this court held that a trial court's consideration of the nature and circumstances of the offense was not improper. Recently, however, this court held in *State* v. *Davis* (1988), 38 Ohio St. 3d 361, 367-373, 528 N.E. 2d 925, 931-936, that only the aggravating circumstances enumerated in R.C. 2929.04 (A)(1) through (7) may be weighed against mitigating factors.

While it may appear by the language of the trial court's sentencing opinion that it committed error in this vein, we do not believe that a resentencing of appellant is mandated. Similar to this court's finding in *State* v. *Sowell* (1988), 39 Ohio St. 3d 322, 329, 530 N.E. 2d 1294, 1303, we find that the trial court utilized the nature and circumstances of the crimes to simply support its finding that the aggravating circumstances outweighed any mitigating factors in the cause *sub judice*. Even assuming *arguendo* that the trial court committed error, no prejudice against appellant is indicated; therefore, we find the trial court's error to be harmless beyond a reasonable doubt.

Appellant also argues that by considering mitigating factors that he did not place in issue, the trial court, in essence, used his failure to place those factors in issue as an aggravating circumstance.

While this court has stated that "no comment on any [mitigating] factor not raised by * * * [the defendant] is permissible," *DePew, supra,* at 289, 528 N.E. 2d at 557, we find no prejudicial error in this respect. A careful review of the sentencing opinion issued by the trial court convinces us that the court did not weigh against appellant his failure to raise all possible mitigating factors. The court, in our view, merely noted that three mitigating factors did not exist and were therefore entitled to no weight. While this was not entirely proper, *id.,* we find that no prejudice resulted from this. Accordingly, we overrule appellant's twelfth proposition of law.

In his thirteenth proposition of law, appellant alleges that the trial court denied his motions to suppress evidence and sever counts without placing findings of fact on the record. This omission, appellant claims, violated Crim. R. 12(E) to his prejudice.

Crim. R. 12(E) provides in part that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."

However, in order to invoke the rule, the defendant must request that the court state its essential findings of fact in support of its denial of a motion. See *Bryan* v. *Knapp* (1986), 21 Ohio St. 3d 64, 21 OBR 363, 488 N.E. 2d 142. Our review of the record fails to uncover any request by appellant in this

---

lives he left behind, simply to satisfy his sexual gratification and to avoid apprehension.

"Against the above aggravating circumstances and the evidence relevant thereto, the Court considered and weighed * * * the nature and circumstances of the offense * * *.

"* * *

"With respect to the nature and circumstances of the offenses, we find there is nothing that can be said in mitigation for the Defendant * * *. When one reviews the nature and circumstances of the offenses, a reviewer is left with factors relevant only to aggravating circumstances."

vein. In any event, even if we were to find the trial court's omission was erroneous, no prejudice is apparent. The trial court's denial of the pre-trial motions was legally justified and in most instances was supported by some factual findings on the record.

Thus, we overrule appellant's thirteenth proposition of law.

In his fifteenth proposition of law, appellant simply reiterates other propositions of law heretofore discussed, and argues that these errors compromised the reliability and the appropriateness of his capital convictions and death sentences.

Since we have found that none of these alleged errors prejudiced appellant, we overrule this cumulative proposition of law.

In his sixteenth proposition of law, appellant contends that since Ohio trial courts have failed to file sentencing opinions in cases where capital defendants received life sentences, the proportionality review required by R.C. 2929.05 violates due process.

In our view, appellant's argument is without merit. State law prescribes a proportionality review that includes only cases in which the death penalty was imposed. *Steffen, supra,* at paragraph one of the syllabus. Accord *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 263, 527 N.E. 2d 844, 855. We do not believe that such a practice is violative of due process, and therefore we find this proposition of law to be not well-taken.

In his seventeenth and final proposition of law, appellant argues that Ohio's death penalty statute is unconstitutional on several grounds. All of the grounds recited by appellant, however, have been rejected by this court in *Jenkins, supra,* and *Steffen, supra.* As such, we overrule this proposition of law summarily. *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568, syllabus.

Having reviewed the various propositions of law raised by appellant, and having found none of them to be meritorious, we next turn to our responsibility of independently weighing the aggravating circumstances against the mitigating factors of the case.

In so doing, we review the testimony in the record, and note that appellant's main witness in the penalty phase was Dr. James W. Siddall, a clinical psychologist. Siddall interviewed appellant and gave him a battery of standard psychological tests. He also interviewed appellant's wife, the coroner, and attorneys for both sides, and reviewed police and medical reports. Appellant's wife told Siddall that appellant was "very possessive, jealous, * * * short-tempered and easily provoked." The medical records apparently indicated that appellant had suffered from acute encephalitis in 1966, and that he had attempted suicide in 1980 by running a hose from his car's exhaust pipe into the passenger compartment.

Appellant told Siddall that he had used marijuana and alcohol since age thirteen and had abused LSD, PCP, Quaaludes, and caffeine pills between ages sixteen and nineteen.

Psychological testing indicated a tendency for appellant to suffer from "variable mood states, prolonged depression, self-depreciation, [and] impulsive angry outbursts," as well as "a strong proneness [*sic*] to the development of addictive behaviors." Siddall diagnosed appellant as suffering from several mental disorders: sexual sadism, major depression, and various forms of substance abuse. It is apparent that these disorders could have contributed to appellant's behavior.

Appellant's father, two sisters, and high school coach also testified at his mitigation hearing. Appellant's father stated that he "spent a lot of time away from home," and that ap-

pellant was very close to his mother. One of appellant's sisters testified that the crimes were "totally out of character" for appellant. Other family members expressed disbelief that appellant had committed these crimes. They testified that appellant was kind, likable, even-tempered, polite and close to his family. One sister said, "My children idolize him."

Also at the mitigation hearing, appellant made an unsworn statement. He explained that he had attempted suicide in high school because "I just felt like nobody loved me anymore," but found that "people really did care about me." He told of his close relationship with his mother, and recounted how she suddenly died. He testified that he drank "up until two years ago" .and that he smoked marijuana. He spoke of his love for his wife and family, and expressed sympathy for the Bowsers and Sedgwicks. Finally, he told the court that he was afraid to die because he would never see his family again.

With respect to the enumerated mitigating factors set forth in R.C. 2929.04(B)(1) through (6), we find that appellant's evidence arguably satisfies number four, his relative youth, and number five, his lack of a significant history of prior criminal convictions and delinquency adjudications.

Appellant's youth is not entitled to much weight as a mitigating factor. Since he was twenty-two and twenty-three years of age at the time the crimes were committed, it is clear that appellant was well past the age of majority and the evidence demonstrates that he was sufficiently mature to appreciate the consequences of his conduct.

Likewise, factor five offers little, if anything, in mitigation. While appellant's prior record was insignificant in magnitude, the character of his prior conviction, an aggravated felony of the third degree, militates against giving this factor very much weight.

With regard to the other enumerated statutory factors, Siddall's testimony does not establish that appellant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform to the law.

We note the possible effect of appellant's personality disorders on his behavior. Dr. Siddall testified to the "potential for a typical drug-induced behavior based on prior neurological trauma * * *." He noted that people with disorders like appellant's behave impulsively, "exhibit a lack of anger control, [and] show mood instability." We also consider appellant's good personality traits, as testified to by his family. While such is worthy of consideration, especially in light of the catchall factor in R.C. 2929.04(B)(7), it is not entitled to much weight.

Upon a careful consideration of the foregoing, we find that the aggravating circumstances reviewed outweigh the mitigating factors.

In addition, we find that the mitigating factors do not outweigh appellant's strangulation of Trina Bowser after raping her anally and vaginally. This crime, too, was part of appellant's extended course of violent criminal conduct.

Despite the existence of some mitigating factors, the aggravating circumstances outweigh them beyond a reasonable doubt; therefore, we find that the death sentences rendered herein are appropriate.

Finally, this court must decide whether the sentences of death imposed here are excessive or disproportionate to the sentence in similar cases. We hold that both death sentences are proportionate to the sentences approved for multiple murder in *Poindexter, supra,* and *State* v. *Brooks* (1986), 25 Ohio St. 3d 144, 25 OBR 190, 495

N.E. 2d 407, as well as the sentences approved in the rape-murder cases of *Steffen, supra,* and *Apanovitch, supra.* Accordingly, we agree with the court of appeals that the penalty imposed here is entirely appropriate.

In conclusion, we first find that there is no merit to any of the specific propositions of law raised by appellant concerning his trial that would compel a reversal of his convictions of the crimes described. Second, we find that the aggravating circumstances outweigh any and all mitigating factors attempted to be presented by appellant, beyond a reasonable doubt. Third, we find the sentences of death to be appropriate in this case, as they are neither excessive nor disproportionate to the penalty imposed in similar cases. Therefore, in accordance with R.C. 2929.05(A), we affirm the convictions and sentences of death in this cause.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., LOCHER, HOLMES and DOUGLAS, JJ., concur.

H. BROWN, J., concurs in judgment only.

WRIGHT, J., concurs in part and dissents in part.

WRIGHT, J., concurring in part and dissenting in part. I concur in upholding appellant's conviction, but would remand for another sentencing proceeding.

The majority correctly cites *State v. Davis* (1988), 38 Ohio St. 3d 361, 367-373, 528 N.E. 2d 925, 931-936, for the proposition that *"only* the aggravating circumstances enumerated in R.C. 2929.04(A)(1) through (7) may be *weighed* against mitigating factors,'' in determining whether the penalty of death is an appropriate sanction. (Emphasis added.) The majority also accurately cites the trial court's sentencing opinion, by way of a footnote, in which the three-judge panel improperly *weighed* and ''consider[ed] as relevant to the aggravating circumstances the testimony and evidence relating to the brutal and depraved manner in which the Defendant strangled or attempted to strangle his victims, the frequency of his attacks, his seeming indifference and lack of remorse for the trail of death and broken lives he left behind, simply to satisfy his sexual gratification and to avoid apprehension.''

There is no way I can square the result achieved today with *Davis*. Further, there is no way that we can apply the doctrine of harmless error here. Given the facts in this case, if I were the trier of the fact I would most probably impose the death penalty on Benner; however, that is not our function.

Indeed, what we have done today is to ensure that one day Benner will obtain a reversal. At that point, the now existing panel will probably not exist, which will ensure a definite term of incarceration rather than the death penalty for Benner.

For the reasons aforesaid, I respectfully dissent in part.