OPINION
{¶ 1} Thomas Leist is appealing the judgment rendered against him in the amount of $461,325.00 plus post judgment interest and costs awarded to plaintiffs by the trial court after a bench trial. The history of the case and the facts as found by the trial court and its legal conclusions are fully and succinctly set forth in its entry and order as follows:
 {¶ 2} "Introduction
 {¶ 3} "This case involves an approximate 10.5 acre parcel of real estate located in Germantown, Ohio. In August 2000, the real estate was unimproved. In Germantown, it was known as the `Doc Hamilton property' because its previous owner was a medical doctor with the last name of Hamilton. (The real estate will be referred to as the `Doc Hamilton property'). In August 2000, the Doc Hamilton property was owned by Doctor Hamilton's children, James Hamilton and Susan Bobb. The main players in this drama are Scott Weidle, the principal of the Weidle Corporation, and Thomas Leist, a real estate agent who in August 2000 had a continuing business relationship with the Weidle Corporation.
 {¶ 4} "This case, in the end, is about Mr. Leist's betrayal of his relationship with Mr. Weidle and the Weidle Corporation. Mr. Leist's actions resulted in the Weidle Corporation suffering the loss of the net profit ($461,325.00) the Weidle Corporation would have generated from the development of the Doc Hamilton property. Thomas Leist is legally responsible for this loss, and the remainder of this decision will articulate the findings of fact and legal conclusions which come together to form the conclusion that the Weidle Corporation is entitled to judgment against Thomas Leist in the amount of $461,325.00.[0] (FN1-The complaint asserts a claim for both D. Scott Weidle and the Weidle Corporation. Since it was the Weidle Corporation that would have developed the Doc Hamilton property, the judgment is awarded to the Weidle Corporation).
 {¶ 5} "Findings of Fact
 {¶ 6} "1. The Weidle Corporation, in addition to other activities not germane to this discussion, is in the business of acquiring real estate for residential development;
 {¶ 7} "2. D. Scott Weidle is the general manager and principal of the Weidle corporation;
 {¶ 8} "3. Thomas Leist is a real estate agent who in August 2000 was associated with RE/Max Relators. In August 2000 Mr. Leist and the Weidle Corporation had an ongoing business relationship. This relationship primarily involved Mr. Leist's efforts to sell lots in residential developments owned by the Weidle Corporation. Mr. Leist would, of course, receive a commission from the Weidle Corporation for each lot sold;
 {¶ 9} "4. Mr. Leist, by 1999, was the exclusive real estate agent involved in the Weidle Corporation's residential developments;
 {¶ 10} "5. This situation changed somewhat in 1999 because Mr. Weidle used another real estate agent, Jeff Fannin, to market and sell lots in a Weidle Corporation development known as Broadhill Estates. It appears, though this is legally not relevant, that Mr. Leist was upset with Mr. Weidle because of Mr. Fannin's role with Broadhill Estates. Mr. Leist felt betrayed by Mr. Weidle, and he likely felt that his role with the Weidle Corporation was anything but secure;
 {¶ 11} "6. This background leads to August 2000 and the controversy concerning the Doc Hamilton property. In mid August 2000 Mr. Weidle asked Mr. Leist to approach James Hamilton and make an initial offer of $8,000 per acre for the Doc Hamilton property. Mr. Leist, though there was no discussion concerning a fee, agreed to contact Mr. Hamilton. It is clear that Mr. Leist was not acting as a volunteer, and if his efforts resulted in the Weidle Corporation purchasing the Doc Hamilton property, he expected to earn a fee;
 {¶ 12} "7. Mr. Leist, instead of contacting Mr. Hamilton on behalf of the Weidle Corporation, contacted Mr. Hamilton for his own benefit. Mr. Leist initially talked to Mr. Hamilton's wife in late August, and she informed him that the property could be purchased for $80,000.00. Mr. Leist, based upon this, submitted in early September, probably September 4 which was Labor Day, a proposed option to purchase real estate contract with a purchase price of $80,000.00 if the option was exercised (Plaintiffs' Exhibit 8);
 {¶ 13} "8. Mr. Leist's efforts regarding the purchase of the Doc Hamilton property were also made on behalf of John Evans. Mr. Evans is also a real estate agent, and Mr. Leist and Mr. Evans both worked at RE/Max in August 2000. Mr. Leist and Mr. Evans agreed to jointly purchase the Doc Hamilton property, but Mr. Evans' involvement was induced by Mr. Leist inaccurately informing Mr. Evans that he had `been fired' from the Doc Hamilton project;
 {¶ 14} "9. Mr. Hamilton's actual desired price was $100,000.00. Upon receipt of the option contract, Mr. Hamilton informed Mr. Leist that his asking price was $100,000.00, and he did not desire an option contract;
 {¶ 15} "10. Scott Weidle, because he had heard nothing from Mr. Leist, called Mr. Leist on September 7, 2000. Mr. Leist told Mr. Weidle that he was `still researching' the project. Mr. Weidle became quite upset with this response, and told Mr. List [sic] that he would obtain the services of another realtor to approach Mr. Hamilton;
 {¶ 16} "11. Mr. Weidle, at the suggestion of his employee, Dave Shuey, contacted, through Mr. Shuey, Michelle Collins, a real estate broker/agent. Mr. Shuey and Ms. Collins met on September 8, 2000 and it was agreed that Ms. Collins, on behalf of the Weidle Corporation, would submit a proposed purchase contract to Mr. Hamilton reflecting a purchase price of $85,520.00 which represents $8,000.00 per acre, the amount initially discussed by Mr. Weidle and Mr. Leist. Ms. Collins, on September 8, 2000, delivered to Mr. Hamilton a proposed purchase contract. (Plaintiffs' Exhibit 15). This contract, it is noted, indicated that Ms. Collins' company, Collins Real Estate Services, was being compensated by the buyer;
 {¶ 17} "12. Mr. Hamilton, at this point and with two potential buyers for a parcel of real estate which had previously generated little interest, contacted Mr. Leist and informed him of the second offer. Mr. Leist inquired concerning the price Mr. Hamilton and his sister desired. Mr. Hamilton informed Mr. Leist that the desired price was $100,000.00; this conversation led to the September 10, 2000 contract whereby Mr. Leist and Mr. Evans agreed to purchase the Doc Hamilton property for $100,000.00 (Plaintiffs' Exhibit 4). Ultimately, a General Warranty Deed was signed and recorded transferring the Doc Hamilton property to Mr. Leist and Mr. Evans;
 {¶ 18} "13. Mr. Weidle's offer of $8,000.00 per acre was not a firm price. Mr. Weidle desired the property for development, and he would have increased his offer in order to obtain the Doc Hamilton property. The Weidle Corporation, based upon the preponderance of the evidence, would have purchased the property for $100,000.00 — Mr. Hamilton's desired price — if Mr. Leist had not intervened;
 {¶ 19} "14. Mr. Leist and Mr. Evans purchased the Doc Hamilton property so that they could develop the property for residential use. Mr. Leist and Mr. Evans, however, sold the Doc Hamilton property to Associate Construction with Associate Construction developing the property for residential use;
 {¶ 20} "15. If the Weidle Corporation had obtained the Doc Hamilton property, the corporation, with reasonable certainty, would have generated from the real estate's development a net profit of $461,325.00. This conclusion is reached based upon Mr. Weidle's testimony which the Court found reasonable and persuasive.
 {¶ 21} "Conclusions of Law
 {¶ 22} "The Court, from the above findings of fact, makes the following legal conclusions:
 {¶ 23} "1. In August 2000 Mr. Weidle, on behalf of the Weidle Corporation, and Mr. Leist entered into a contract wherein Mr. Leist agreed to approach James Hamilton regarding the Weidle Corporation's purchase of the Doc Hamilton property. This conclusion is reached even though there was no discussion concerning how Mr. Leist would be compensated for his services. Mr. Leist, as admitted during his cross-examination testimony, was not a volunteer, he expected compensation for his services. Simply because a specific fee or commission was not discussed does not negate the existence of a contract. This conclusion is evident if the analysis is viewed from Mr. Leist's perspective. If it is assumed that Mr. Leist secured through his services the purchase of the Doc Hamilton real estate for the Weidle Corporation and Mr. Weidle had refused to compensate Mr. Leist for his services, Mr. Leist would have been able to establish the existence of a contract and entitlement to a fee because Mr. Leist would have acted under circumstances which would have `reasonably cause[d] [Mr. Weidle] to believe he [would] be expected to compensate [Mr. Leist] for [his] services.' IrongateRelators, Inc. v. Thomas 1998 Ohio App. Lexis 688 at *10 (Greene Co.) Quoting Ostendorf-Morris Co. v. Slyman (1982)6 Ohio App.3d 46, 47, 452 N.E.2d 1343 (Cuyahoga Co.);
 {¶ 24} "2. It is noted, though this was a defense raised in Mr. Leist's Answer but not asserted at trial, that the statute of frauds does not apply to these facts. Irongate Realtors, Inc. v.Thomas, supra;
 {¶ 25} "3. Mr. Leist, by pursuing the purchase of the Doc Hamilton property for his own benefit, breached the contractual and fiduciary duties he owed Mr. Weidle and the Weidle Corporation. See O.R.C. § 4735.65 and 4735.62;
 {¶ 26} "4. It is, finally, concluded that Mr. Leist's breach of the contractual and fiduciary duties owed to Mr. Weidle and the Weidle Corporation directly and proximately caused damage to the Weidle Corporation in the amount of $461,325.00. This conclusion is reached based upon Mr. Weidle's testimony concerning damages, and represents the net profit the Weidle Corporation lost because the corporation was deprived of the opportunity to develop the Doc Hamilton property. This conclusion discounts the argument that the Weidle Corporation's fixed costs — office space, payroll, and the like — should be included in the calculation. The corporation's fixed costs continued even though the Doc Hamilton project did not occur.[0] (FN2-In fact, especially in litigation involving government contracts, overhead expenses are often asserted as an element of damages. In such cases, either the direct cost method or the so called Eichley formula is used to calculate the portion of the claimant's overhead expenses that should be included in the damage calculation). The award of the Weidle Corporation's lost profit is not too speculative. Lost profits triggered by a breach of contract are recoverable if: `(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.' Charles R. CombsTrucking, Inc. v. International Harvester Co. (1984)12 Ohio St.3d 241, 461 N.E.2d 883 (¶ 2 of syllabus); Davis v. SunRefining Marketing Co. (1996) 109 Ohio App.3d 42,671 N.E.2d 1049 (Mont. Co.).[0] (FN3-The term `reasonable certainty,' though it would seem to imply more, has been interpreted to mean probability. State v. Benner (1988) 40 Ohio St.3d 301,533 N.E.2d 701. Ruge v. Conrad 1997 Ohio App. Lexis 4325 (Mont. Co.)). The testimony concerning the Weidle Corporation's lost profit regarding the Doc Hamilton property meets this test.
 {¶ 27} "Conclusion
 {¶ 28} "The Weidle Corporation, based upon the findings of fact and legal conclusions, is granted judgment against Thomas Leist in the amount of $461,325.00 plus post judgment interest and costs.
 {¶ 29} "So ordered."
 {¶ 30} Leist's appeal contests only the amount of the award.
 {¶ 31} First, he contends that the appropriate measure of an award where a fiduciary duty is breached in a real estate case is the value of the converted property at the time of the conversion. In this case, that would amount to no damages awarded to the plaintiffs, which upon the facts set forth by the trial court would be an outrageous conclusion to the matter.
 {¶ 32} Secondly, Leist admits that lost profits is an appropriate measure of an award in such a case as presented here, but contends that there is no evidence that profits were within the contemplation of the parties at the time. We find it ludicrous to suggest that these experienced businessmen would pursue a real estate transaction without a profit motive.
 {¶ 33} Finally, the appellant contends that the amount of lost profits found by the trial court were not proven by the plaintiffs with reasonable certainty.
 {¶ 34} But as the appellees pointed out in their brief:
 {¶ 35} "Scott Weidle testified as to the specific income he could make from the sale of lots, as well as the specific number of lots that could be developed on the subject parcel. He determined installation, landscaping and financing costs with absolute specificity. Id. [Tr., p. 38]. He calculated commissions owed to relators, gross profit margins, costs of installation of utilities and even reduced his claim by costs for marketing of lots. Id. p. 39. The testimony was remarkable and consistent and established the knowledge and ability of Weidle Corporation to develop real estate based upon a specific understanding of profits, as demonstrated on a spreadsheet admitted as an exhibit. Id. p. 40. The testimony of Weidle was conservative [sic] completely uncontradicted (Id. p. 42),
 "* * * {¶ 36} "The Trial Court was very specific in its review of those lost damages and conclusions. The Court noted that the Weidle testimony included discounts for `fixed costs-office space, payroll, and the like . . .' demonstrating specifically the net `profit' lost in a fashion which was `not too speculative,' according to the Judge." Brief, 6-7.
 {¶ 37} The above assertions are fully supported by the record. Mr. Weidle's lengthy and in-depth testimony, evidencing his mastery of and long experience in his real estate development business, evidently impressed the trial court as it found his testimony "`reasonable and persuasive." Opinion, 5.
 {¶ 38} When damages for lost profits are sought, the amount of the profits lost may not be remote or speculative and must be shown with reasonable certainty. Charles R. Combs Trucking, Inc.v. International Harvester Co. (1984), 12 Ohio St.3d 241;Gahanna v. Eastgate Properties, Inc. (1988), 36 Ohio St.3d 65. When lost profits result from denial of a new business opportunity, as this was, "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises, and the like." AGF, Inc. v. Great LakesHeat Treating Co. (1990), 51 Ohio St.3d 177, 181, quoting Restatement of the Law 2d, Contracts, Section 352, Illustration 6. Such evidence, when offered, constitutes "a reasonably certain factual basis for computation of probable losses." Id., at 182.
 {¶ 39} AGF, Inc. imposes a substantiation requirement that raises the issue above the usual "credibility call" a court makes concerning a witness' testimony. The witness, or the party offering his testimony, must provide corresponding data that shows the witness' opinion testimony is reliable. Defendant-Appellant Leist argues that Plaintiff-Appellee Weidle failed to satisfy the requirement imposed by AGF, Inc. because Weidle offered but one document in evidence, Plaintiff's Exhibit 25, which is a mere summation of the cost and sales figures to which Weidle testified. That is incorrect.
 {¶ 40} Plaintiff's Exhibit 6 is a copy of an engineering services contract between Defendant Leist and Norfleet, Brown 
Petkewicz, Inc. for the project Leist had hoped to develop on the property. It is detailed, and states a total cost of $42,450. The exhibit substantiates Weidle's estimate of $35,000, which appears to be conservative.
 {¶ 41} Plaintiff's Exhibit 9 appears to be Leist's own estimates for the project. In addition to the engineering fees in Exhibit 6, it includes estimates for the costs of land, for construction, CPA/Legal fees, interest, and a property profile of another development in Fairborn.
 {¶ 42} Plaintiff's Exhibit 21 is a collection of purchase agreements from Weidle's past sales in the Ron Heights subdivision that Weidle developed in Germantown. They substantiate the sales figures to which Weidle testified.
 {¶ 43} The foregoing items of documentary evidence were offered in connection with Weidle's claim for breach of fiduciary duty more so than his claim for lost profits. However, they were before the court, and the information in them substantiates Weidle's opinion testimony concerning costs he would have incurred as well as the revenue from the sales he might expect to receive. Some of the costs he opined were not specifically shown, but necessarily could only be estimates. An example is Weidle's estimate of $50,000 for cost of financing, which depends not only on prevailing rates of interest but the time it takes to sell the properties developed. However, evidence of lost future profits need only be reasonable, not specific. AGF, Inc.
 {¶ 44} The trial court did not abuse its discretion when it awarded damages for lost profits on the record before it. Further, because the amount of the award is supported by competent, credible evidence, the judgment is not against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279.
 {¶ 45} The sole assignment of error challenging the amount of the damages awarded is overruled and the judgment is affirmed.
Fain, P.J., and Grady, J., concurs.