OPINION
Defendant-appellant Jeffrey A. Young appeals his conviction and sentence entered by the Morrow County Court of Common Pleas on one count of aggravated vehicular homicide, in violation of R.C. 2903.06. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On February 18, 2000, the Morrow County Grand Jury indicted appellant on the aforementioned charge. The indictment also alleged appellant was under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse at the time of the offense. The charge arose out of a single car accident on June 6, 1999, which resulted in the death of Christopher Colegrove, appellant's friend. The matter came on for bench trial on March 15, 2001.
The following evidence was adduced at trial. On the evening of June 5, 1999, appellant drove a green 1998 Honda Civic, which was titled in the name of a corporation owned by his parents, to the Mount Gilead, Ohio residence of Colegrove. Bradley Dudgeon, a friend of Colegrove, subsequently arrived at the residence. Dudgeon, was introduced to appellant as "Wedge." At approximately 9:30 p.m., the men traveled to a nightclub in Marion, Ohio. Dudgeon drove his own vehicle, and appellant drove the Honda Civic with Colegrove as his passenger.
The men spent several hours at the nightclub with both appellant and Colegrove consuming alcoholic beverages. At approximately 2:00 a.m. on June 6, 2001, appellant and Colegrove left the nightclub to take a female friend home. Dudgeon observed appellant driving the Honda Civic with Colegrove in the front passenger seat.
At approximately 3:00 a.m. that same day, appellant and Colegrove arrived at the Johnstonville, Ohio residence of Debra Etzwiler. Appellant and Colegrove had telephoned Etzwiler prior to their arrival and she was waiting for them on her porch. The men arrived in the Honda Civic, driven by appellant and Colegrove in the passenger's seat. Etzwiler testified both men appeared to be intoxicated, and both appellant and Colegrove had told her they had used the recreational drug "ecstasy." Appellant retrieved two bottles of beer from the vehicle for himself and Etzwiler. Appellant and Etzwiler drank the beers as well as additional beer. While they sat on the porch and talked, Colegrove took a nap. Appellant and Colegrove left Etzwiler's home at approximately 7:30 a.m. Etzwiler did not observe who was driving the Honda Civic when they left.
At approximately 8:05 a.m., the Honda Civic, which was traveling westbound on U.S. Rt. 42, drifted off the right side of the road, struck a culvert and became airborne. Trooper Jeff Mosley, a member of the Ohio State Patrol's Accident Reconstruction Unit, testified the vehicle, which traveled 106 feet through the air, rotated to the right and tipped forward, resulting in a nose first impact. Thereafter, the vehicle tumbled end over end for 150 feet and came to a rest on its hood. Through the reconstruction of the crash, Mosley determined the vehicle was traveling at a minimum speed of 112 mph when it became airborne.
Emergency personnel who responded to the scene discovered appellant and Colegrove lying outside the vehicle. Both had been ejected and both were critically injured. Colegrove was taken by squad to the Morrow County Hospital, but was immediately transported by life flight to Ohio State University Hospital. At approximately 6:05 p.m., Colegrove died as a result of the injuries he sustained in the crash.
Emergency personnel transported appellant to the Morrow County Hospital, where he was treated. The emergency room doctor ordered a series of lab tests, including a blood alcohol test. The result of blood alcohol test indicated appellant had a blood alcohol level of .180 percent by weight.
Jeffrey Turnau, a criminologist with the Ohio State Patrol, assisted in the investigation of the crash. Turnau conducted a comparison of the soles of appellant's shoes, the soles of Colegrove's shoes, and the accelerator, brake, and clutch pedal pads, which had been removed from the Honda Civic. Turnau discovered a pedal impression on the sole of appellant's left shoe, which perfectly matched the pattern of the brake and/or clutch pedal pad. Turnau explained only a very violent impact, while the shoe was either touching or in close proximity to the pedal, would cause a pedal impression. He noted casual contact, such as ordinary braking or shifting, could not cause a pedal impression. Turnau also testified the pedal impression on appellant's shoe could be seen with the naked eye, stating most pedal impressions require microscopic examination and/or oblique lighting to be discerned.
After the State rested, appellant moved for a directed verdict of acquittal pursuant to Crim. R. 29, which the trial court overruled. Appellant called no witnesses and presented no evidence. Trial court found appellant guilty of aggravated vehicular homicide, and specifically found appellant was under the influence of alcohol at the time of the offense. After a presentence investigation, the trial conducted a sentencing hearing on April 27, 2001, and sentenced appellant to a mandatory term of imprisonment of three years. The trial court memorialized appellant's conviction via Journal Entry filed March 29, 2001, and appellant's sentence via Judgment Entry of Sentence filed May 11, 2001.
It is from this conviction and sentence appellant appeals, raising the following assignments of error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY ADMITTING INTO EVIDENCE CERTAIN HOSPITAL RECORDS ALLEGEDLY DEPICTING THE BLOOD/ALCOHOL LEVEL OF APPELLANT AT THE TIME OF THE ACCIDENT.
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY ADMITTING INTO EVIDENCE THE OPINION OF THE STATE'S EXPERT WITNESS AND HIS TEST RESULTS WHEN THE EXPERT WITNESS FAILED TO TESTIFY THAT HIS OPINION WAS RENDERED WITH A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY.
 THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIMINAL RULE 29 MOTION.
 I
In his first assignment of error, appellant contends the trial court erred in admitting hospital records, which included the result of his blood-alcohol test, into evidence. Appellant specifically challenges the State's failure to lay a proper foundation for the admissions of the records.
As a general rule, authenticated hospital records are admissible at trial.[1] R.C. 2317.422 establishes a procedure whereby hospital records may be authenticated via a sworn, written certification from the custodian of the records rather than requiring the custodian to testify at trial as to the authenticity of the proposed evidence.[2] R.C.2317.422 reads, in pertinent part:
 (A) * * * the records, or copies or photographs of the records, of a hospital, * * * in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon his verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution. * * *
Admission of hospital records via R.C. 2317.422 certification does not offend a defendant's confrontation rights.[3] Upon review of the record herein, we find the hospital records were certified as required by R.C.2317.422. Additionally, Kay Beveridge, medical records supervisor at Morrow County Hospital, testified as to the authenticity of appellant's records, including the results of the blood-alcohol test. Appellant was provided with the opportunity to cross-examine Beveridge.
Furthermore, hospital records are admissible pursuant to Evid. R. 803(6).[4] Evid. R. 803(6) reads:
 A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
Appellant argues the records were inadmissible because the State failed to present foundational evidence as to the reliability of the blood tests. It is well established noncompliance with R.C. 4511.191 does not rendered a blood-alcohol test inadmissible in a prosecution for aggravated vehicular homicide.[5] Any defects in the performance of the blood-alcohol test go to the weight to be given to the evidence, not the admissibility of such.[6]
Based upon the foregoing, appellant's first assignment of error is overruled.
 II
In his second assignment of error, appellant asserts the trial court erred in admitting the opinion of the State's witness as such opinion was not rendered with a reasonable degree of scientific certainty.
Because defense counsel failed to object to the expert's opinion, the alleged error is subject to a plain error analysis. An error "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise."[7] Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.[8]
An expert opinion is competent only if it is held to a reasonable degree of scientific certainty.[9] In this regard, the Ohio Supreme Court has found the term "reasonable certainty" to be synonymous with the term "probability."[10]
Jeffrey Turnau testified as the State's expert witness. Turnau stated he was given an automobile accelerator pad, a brake pedal pad, and a clutch pad as well as two pairs of shoes. The State asked Turnau to perform a pedal impression examination to determine if the shoes had been in contact with one or any of the pedals which he had been provided. Turnau's testimony proceeded as follows:
Q. What was the purpose for examining these exhibits?
 A. I was doing a comparison of any impression I might find on the shoes or impression I might find on the pedals or vice versa.
Q. What did you do to make that comparison?
 A. Just my eye, the unaided eye without any microscope. Just a microscopic examination, then some side lighting, oblique lighting. At the conclusion of that I found an impression that I then put the questioned pads and shoe under a second, under an instrument called digital video microscope. I took photographs and measurements and overlays of that impression and formed a laboratory report conclusion after that.
Q. What was your conclusion?
 A. My conclusion was that there was an impression on the shoe listed in Item 4 as having come from Jeffrey A. Young.
* * *
 A. * * * There was an impression on the bottom of this shoe that I sealed with a petri dish for protection of the impression. That impression was similar, very similar to the brake and clutch pedal pads which bear an identical pattern. So I'm not able to determine which pad could have made the impression but it was one of those two pads.
 Q. * * * the shoes that you identified as to having been submitted to you with the indication that they came from Christopher Colegrove. Did you find any pedal impression on these?
A. No, I did not.
* * *
 Q. Based on your training and your experience, what does it take to cause the kind of impression that you observed on the left shoe there?
 A. An impression on this shoe, this particular shoe, this is — this was the most pronounced pedal impression I have ever examined in my career. I have examined close to about one hundred pedal impressions on shoes and pads. This is the most pronounced impression I have ever seen on a shoe. That's due to the impact and the material involved and the color of the shoe, the color, the age, the softness, that type of thing.
* * *
 A. * * * In order to have a transfer, a pattern transfer such as that it would take a violent collision of an automobile and the foot would have to be resting or almost in complete contact with the pad at the moment of impact in order to leave that type of transfer behind.
* * *
 A. * * * This is due to the result of a very violent collision.
 Q. Okay. Would an impression such as that, would that be consistent, for example, with say in the middle of town getting a minor fender bender that cars aren't moving more than 20 miles an hour?
A. No. * * *
 Q. Do you have an opinion to a reasonable degree of scientific certainty whether a pedal impression such as that would be consistent with an impact say for instance over a 100 miles an hour?
 MR. REDMOND: I'm going to object. There has been no foundation for this.
* * *
 THE COURT: * * * I would like to know about the force of the impact not necessarily the speed of the vehicle, maybe that would. I'm going to sustain the objection.
* * *
 Q. Can you tell us what kind of impact that it would take to make such an impression that you observed?
 A. In my opinion it would take a very violent impact. An impact where you would have an extremely rapid deceleration, almost an instantaneous deceleration. Meaning a car hitting another object and coming to a complete stop, all inertia being eliminated and just coming to a complete stop almost instantaneously.[11]
A review of Turnau's testimony indicates the witness unequivocally expressed his opinion the impression on appellant's left shoe was caused by either the brake or clutch pedal pads. Further, Turnau opined a very violent impact caused such an impression. I in the absence of an objection, we will not speculate the appellee would have been unable to lay a proper foundation for either of these two opinions.
Assuming, arguendo, the trial court erred in admitting Turnau's opinion, we find the outcome of the trial would not have been otherwise; therefore, such did not rise to the level of plain error.
Appellant's second assignment of error is overruled.
 III
In his final assignment of error, appellant contends the trial court erred in overruling his Crim. R. 29 motion for acquittal. Specifically, appellant assets the State failed to prove the culpable mental state of "reckless."
"Crim. R. 29(A) requires a trial court, upon motion of the defendant, to enter a judgment of acquittal of one or more offenses charged in an indictment if the evidence is insufficient to sustain a conviction of the offense or offenses."[12] However, a trial court "may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt."[13]
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[14]
Appellant was convicted of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2), which provides:
 (A) No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft, shall cause the death of another or the unlawful termination of another's pregnancy in any of the following ways:
* * *
(2) Recklessly;
R.C. 2901.22 defines "recklessly" as follows:
 (C) A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
We agree with appellant proof of excessive speed in the operation of an automobile is not, in and of itself, always sufficient to prove recklessness. However, as the Sixth District in State v. Whittaker[15]
noted:
 This is not to say that speeding alone can never amount to criminal recklessness. "[W]hen the concomitant facts show an unusually dangerous situation and a consciousness on the part of the driver that his conduct will in common probability result in injury to another of whose dangerous position he is aware and he drives on without any care whatever, and without slackening his speed, in utter heedlessness of the other person's jeopardy, speed plus such unusually dangerous surroundings and knowing disregard of another's safety may amount to wantonness."[16]
In accordance with Whittaker, we find the escalation of speed of a vehicle corresponds to the degree of a driver's recklessness. Herein, appellant was operating the vehicle at a rate of speed in excess of 112 mph. We find this escalation of speed of appellant's vehicle alone constitutes recklessness. Furthermore, the evidence of the excess speed coupled with the evidence appellant was driving with a blood alcohol level in excess of the legal limit, had ingested the drug "ecstasy" during the evening hours preceding the collision, and, while speeding, allowed the vehicle to travel off the roadway, losing control, amounts to recklessness. Taking this evidence in a light most favorable to the prosecution, we find the trial court did not err in overruling appellant's Crim. R. 29 motion for acquittal.
Appellant's third assignment of error is overruled.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Morrow County Court of Common Pleas is affirmed.
Costs assessed to appellant.
Hon. William B. Hoffman, P.J., Hon. Sheila G. Farmer, J., Hon. John W. Wise, J., concur.
[1] Hunt v. Mayfield (1989), 65 Ohio App.3d 349.
[2] Id. at 408; Hunt v. Mayfield, supra at 353.
[3] State v. Spikes (1981), 67 Ohio St.2d 405, syllabus one.
[4] See, State v. Jones (April 13, 1988), Stark App. No. 1997CA00234, unreported, citing Stengel v. Belcher (1975 C.A.6), 522 F.2d 438, 445;Masek v. Brandt (1971), 26 Ohio Misc. 178, 180.
[5] State v. Runnels (1989), 56 Ohio App.3d 120, 124; State v. Kutz
(1993), 87 Ohio App.3d 329, 335. 
[6] State v. McKinnon (1987), 38 Ohio App.3d 28.
[7] State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
[8] Id. at paragraph three of syllabus.
[9] State v. Jackson (2001) 92 Ohio St.3d 436, 447, citing State v.Benner (1989), 40 Ohio St.3d 301.
[10] Id.
[11] Tr., Vol. I at 54-59.
[12] State v. Pickett (1996), 108 Ohio App.3d 312, 314.
[13] Id; see, also, State v. Bridgman (1978), 55 Ohio St.2d 261, syllabus.
[14] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[15] State v. Whittaker (1996), 111 Ohio App.3d 609.
[16] Id. at footnote 2. (Citations omitted).