[Cite as *State v. Armstrong*, 2013-Ohio-2618.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**PORTAGE COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-P-0018** |
| LEONARD J. ARMSTRONG, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas.
Case No. 2011 CR 0425.

Judgment: Affirmed in part; reversed in part and remanded.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Shubhra N. Agarwal*, 3766 Fishcreek Road, Suite 289, Stow, OH 44224-4379 (For Defendant-Appellant).

TIMOTHY P. CANNON, P.J.

{¶1} Appellant, Leonard J. Armstrong, appeals the judgment of the Portage County Court of Common Pleas. After entering a plea of no contest to count one of the indictment charging appellant with the offense of murder, in violation of R.C. 2903.02(A) and R.C. 2929.02, and count two, murder, in violation of R.C. 2903.02(B) and R.C. 2929.02, appellant was sentenced to a definite term of imprisonment of life with parole

eligibility after 15 years. For the following reasons, we affirm in part, reverse in part, and remand this matter for proceedings consistent with this opinion.

{¶2} Appellant was indicted on two counts of murder, pursuant to R.C. 2903.02(A) and (B), for the death of Jeffrey Sipes. Appellant entered a plea of not guilty by reason of insanity. Following an evaluation at the Summit Psychological Association, the parties stipulated to the findings of the evaluation that appellant was sane and able to stand trial. Appellant filed a motion to suppress his statements made to police on June 16, 17, 21, and 22, 2011. Appellant also moved to suppress a black memo notebook taken from his apartment by the police pursuant to a search warrant.

{¶3} At the hearing on the motion to suppress, the state presented the testimony of Detective DiJerome of the City of Kent Police Department who was assigned to the investigation of the murder of Sipes, which occurred on June 6, 2011. Sipes was found in his apartment with multiple stab wounds. A broken kitchen knife was also found in his apartment—the blade was found on the kitchen counter, and the handle was found in the hallway of the apartment. DNA was found on the handle of the knife.

{¶4} After learning that appellant had lived with Sipes and may have a key to his apartment, Detective DiJerome ran a background check on appellant and discovered he had a criminal history in New Jersey and Florida. Detective DiJerome then learned the DNA on the knife had a partial hit on the CODIS database from someone in New Jersey. Detective DiJerome, along with another officer, went to appellant's apartment on June 16, 2011, to speak with him regarding Sipes. Detective

2

DiJerome testified that the conversation lasted nine minutes. Detective DiJerome stated he did not advise appellant of his rights, as he was not under arrest.

{¶5} Detective DiJerome testified that on the following day, June 17, 2011, he and Officer Ennermoser again visited appellant's apartment to interview him. This interview lasted 16 minutes. Again, Detective DiJerome testified that he did not advise appellant of his rights because he was not under arrest, "he was free to leave at any time," and the interview occurred at his own residence. Officer Ennermoser reiterated that the interview was conducted at appellant's apartment and that he was not in custody.

{¶6} During this visit, Detective DiJerome obtained a DNA sample "because [the officers] were checking anybody that had actually been in the apartment to try to eliminate them." During this conversation, Detective DiJerome learned that appellant had stopped by Sipes' apartment in April 2011 and had a bowl of soup, and that he had a previous disagreement with Sipes.

{¶7} Then, on June 21, 2011, Detective DiJerome and Officer Ennermoser again interviewed appellant; this interview lasted 14 minutes. Detective DiJerome stated they had confirmation that appellant's DNA was found on the knife handle found in Sipes' apartment. Detective DiJerome testified that when he arrived at appellant's apartment, he informed appellant he was not under arrest and was free to leave at any time, but that he wanted to show appellant some pictures. Officer Ennermoser testified that Detective DiJerome informed appellant he was not under arrest and did not have to answer any questions.

3

**{¶8}** At this visit, Detective DiJerome showed appellant a picture of the knife handle and informed appellant that his DNA was found on it. Appellant stated he should speak with an attorney. After appellant made this statement, Detective DiJerome and Officer Ennermoser left the apartment.

**{¶9}** On June 22, 2011, Detective DiJerome, along with Detective Bassett, Officer Harris, and Officer Ennermoser, arrived at appellant's apartment to execute a search warrant. Detective DiJerome testified that the purpose of the search warrant was to look for the following: "Any object or item that may contain biological evidence (blood/DNA), including but not limited to shoes or clothing. Key(s) to apartment building located at 933 Lawrence Drive, and keys(s) to apartment #303, located at 933 Lawrence Drive, located in the City of Kent, County of Portage, State of Ohio."

**{¶10}** Appellant was home when the officers knocked on his door. Appellant was advised he was free to leave and was not under arrest, and the officers were there to execute a search warrant. He chose to remain on his front porch during the search of his apartment.

**{¶11}** Detective DiJerome testified that during his search he opened a drawer and found a memo book, which he knew, in his experience, could be used to conceal items such as keys and money. He testified that he opened the memo book in search of the key to Sipes' apartment and any biological evidence that may have been transferred to its pages. He observed a writing about the homicide of Sipes on the third page. The entry stated: "Man killed in apartment. Silver Meadows. Police Investigating. Mystery. Beware."

4

{¶12} Officer Ennermoser, who had taken a picture of the aforementioned entry, flipped the page. On the following page of the memo book, the entry stated: "Sir, I awoke at 9:30 am. Tuesday morning. It was very dark and raining. I don't know why, then it started to dawn on a new exodus on Sunday, June 5, I did indeed kill Jeffrey Sipes. Approximate."

{¶13} Detective DiJerome testified that he did not look through any of the other pages, but he took the memo book to appellant and asked if it belonged to him and if it was his writing. Appellant confirmed both. Detective DiJerome returned to the inside of the apartment to continue the search while Officer Ennermoser stayed with appellant on the front porch.

{¶14} Officer Ennermoser then asked appellant if an accident occurred in Sipes' apartment, to which appellant replied, "No." Appellant informed Officer Ennermoser that he did not wish to speak with her, and not replying, she remained kneeling by his side. Appellant then began to talk about his dysfunctional family, becoming increasingly agitated.

{¶15} At this point, Detective DiJerome joined appellant and Officer Ennermoser on the front porch. Detective DiJerome testified that he had overheard some of this conversation. In response to Detective DiJerome's statement that appellant may feel better if he just told the truth, appellant confessed to killing Sipes. Appellant was not Mirandized until he was at the police station.

{¶16} The trial court overruled appellant's motion to suppress. Appellant was sentenced, and he then appealed to this court.

{¶17} As his first assignment of error, appellant states:

5

{¶18} "The trial court committed reversible error and plain error in denying Armstrong's motion to suppress the black memo notebook taken from his apartment."

{¶19} An appellate court's review of a decision on a motion to suppress involves issues of both law and fact. *State v. Burnside*, 100 Ohio St. 152, 2003-Ohio-5372, ¶8. During a suppression hearing, the trial court acts as the trier of fact and sits in the best position to weigh the evidence and evaluate the credibility of the witnesses. *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Accordingly, an appellate court is required to uphold the trial court's findings of facts, provided they are supported by competent, credible evidence. *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). Once an appellate court determines whether the trial court's factual findings are supported, the court must then engage in a de novo review of the trial court's application of the law to those facts. *State v. Lett*, 11th Dist. No. 2008-T-0116, 2009-Ohio-2796, ¶13, citing *State v. Djisheff*, 11th Dist. No. 2005-T-0001, 2006-Ohio-6201, ¶19.

{¶20} On appeal, appellant argues the search warrant did not authorize the police officers to search his private papers or writings, and thus, the search and seizure of the black notebook and the writings contained therein were beyond the scope of the warrant and should be suppressed.

{¶21} Conversely, appellee maintains the search warrant authorized the officers to search for "biological/DNA material," and therefore, the search of the memo book was within the scope of the search warrant.

{¶22} In evaluating a suppression motion as the trier of fact, the trial court is required to state its essential findings of fact on the record pursuant to Crim.R. 12(F).

6

That rule states, "[w]here factual issues are involved in determining a motion, the court *shall* state its essential findings on the record." (Emphasis added.) The underlying rationale of Crim.R. 12(F) is to allow for effective judicial review. *State v. Marinacci*, 5th Dist. No. 99-CA-37, 1999 Ohio App. LEXIS 5279, *4 (Nov. 3, 1999).

{¶23} In overruling appellant's motion to suppress, the trial court did not make *any* factual findings. The trial court only stated that appellant's motion to suppress was without merit, and thus, the notebook and its contents may be introduced as evidence at trial.

{¶24} A trial court's failure to set forth the essential findings may not be fatal, however, in the absence of defendant's timely request or if the appellate record provides a sufficient basis to review appellant's assigned error. *See State v. Sands*, 11th Dist. No. 2006-L-171, 2007-Ohio-35, ¶35; *City of Bedford v. McLeod*, 7th Dist. No. 94649, 2011-Ohio-3380, ¶17; and *State v. Benner*, 40 Ohio St.3d 301 (1988) ("in order to invoke the rule, the defendant must request that the court state its essential findings of fact in support of its denial of a motion").

{¶25} At the outset, we recognize that, although it has not been addressed by the parties, the search warrant is so broadly stated that it is virtually limitless. It authorizes a search for a key to the victim's apartment and also for biological evidence/DNA. The search warrant does not specify whose DNA, but it must be assumed it is the DNA of the victim, because the officers had previously taken appellant's DNA sample. There is, however, no indication why the officers had probable cause to believe the victim's DNA was in appellant's apartment; the only reference to blood was that appellant's DNA was found on the broken knife in the victim's apartment.

7

The search for the victim's DNA in appellant's apartment appears strikingly overbroad. It is fairly common knowledge that DNA is prevalent; it is microscopic. This broad permission, without any stated probable cause that would lead one to believe some particular bit of DNA was present, may have given the officers impermissibly broad authority to conduct this search. If the search was intended to seek blood, it should have simply been limited to that specific type of DNA.

{¶26} There can be few things more private, and therefore more protected from unwarranted intrusion, than one's private notebook. According to the testimony at the suppression hearing, the notebook may have been a place to hide a key and/or it may have plausibly contained DNA evidence. The testimony, however, reveals no justification to believe the victim's DNA was inside the notebook or, specifically, what type of DNA the notebook may have contained. Further, even if the notebook was a place to conceal a key, it does not warrant a page-by-page perusal of the book. Additionally, the testimony at the suppression hearing reveals that Detective DiJerome was not only searching for biological evidence or a key but "anything else that may be pertinent." A search warrant should not give an officer carte blanche authority to search appellant's apartment. The items to be located and seized pursuant to a search warrant must be identified with sufficient particularity.

{¶27} At the hearing, Officer Ennermoser testified that Detective DiJerome came across a "small notebook and he happene[d] to show me a page that has a writing in it[.]" Officer Ennermoser makes it clear she read the notebook because of the "interesting journal article"—not because of the search for DNA or a key, as stated in

8

the warrant; she flipped the page and read the next entry of appellant's notebook which was appellant's confession.

{¶28} The dissent justifies the trial court's ruling by stating that "once seized, the incriminating contents of the notebook [fall] under the plain view doctrine." The dissent's discussion regarding the "incriminating statements" found in the notebook does not properly apply to those exceptions that have developed to eliminate the necessity of a warrant. The dissent suggests the Fourth Amendment permits the officer to seize evidence under the search warrant but then concludes, paradoxically, that there must be an exception to the warrant requirement to read the notebook. However, the plain view exception to the requirement of a warrant is not applicable.

{¶29} Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object – *i.e.*, if 'its incriminating character [is not] "immediately apparent,"' *Horton*, *supra*, at 136 – the plain-view doctrine cannot justify its seizure. *Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987)." *Minn. v. Dickerson*, 508 U.S. 366, 375 (1993).

{¶30} The seizure here was not contraband. It was evidence in the form of a writing that could have been attributed to appellant. This was not within the scope of

9

the search warrant.  The trial court, therefore, erred in overruling appellant's motion to suppress the black memo notebook found in appellant's apartment.

**{¶31}** Appellant's first assignment of error has merit.

**{¶32}** Appellant's second assignment of error states:

**{¶33}** "The trial court committed reversible and plain error in denying Armstrong's motion to suppress his statements to the police."

**{¶34}** Appellant argues he was entitled to be advised of the *Miranda* warnings, as he was in custody.  Appellant argues his statements were not voluntarily made. Appellant cites that two officers arrived at his home on June 16 and 17, 2011, and that these officers knew appellant's DNA matched the DNA on the knife found at the murder scene.

**{¶35}** Statements obtained during the custodial interrogation of a defendant are not admissible at trial unless the police have used procedural safeguards to secure the defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to representation.  *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694.  'Only *custodial* interrogation triggers the need for *Miranda* warnings.'  *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, at ¶47 (emphasis sic); *State v. Biros*, 78 Ohio St.3d 426, 440.  'Custodial interrogation' means 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'  *Miranda*, 384 U.S. at 444.

{¶36} There are two aspects to the issue of whether a person is 'in custody' for the purposes of Miranda. *Thompson v. Keohane* (1995), 516 U.S. 99, 112. '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' Id. (footnote omitted); *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, (determination of whether a suspect was in custody at a particular time requires an inquiry into 'how a reasonable man in the suspect's position would have understood his situation'). In order for custodial interrogation to occur, there must be 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' *California v. Beheler* (1983), 463 U.S. 1121, 1125, quoting *Oregon v. Mathiason* (1977), 429 U.S. 492, 495. An 'objective test' is applied in making this determination. *Thompson*, 516 U.S. at 112. A 'determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' *Stansbury v. California* (1994), 511 U.S. 318, 323.

{¶37} * * *

{¶38} The Due Process Clause of the Fourteenth Amendment's guarantee that no State shall 'deprive any person of life, liberty, or

11

property, without due process of law' condemns the use of coercive police conduct that renders a confession involuntary. See, e.g., *Miller v. Fenton* (1985), 474 U.S. 104, 109-110, 106 S. Ct. 445, 88 L. Ed. 2d 405, and the cases cited therein. 'In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus; *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844 ('[w]hile voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances'). *In re J.C.*, 11th Dist. No. 2011-G-3017, 2011-Ohio-5864, ¶74-78.

{¶39} With respect to the interview of June 16, 2011, the record demonstrates appellant was questioned in his apartment. During the questioning, appellant was advised that he was not under arrest, he was free to leave, and he was not required to answer the officers' questions. Although appellant argues he was not advised of his *Miranda* warnings, he was not subject to a custodial interrogation, for it is well established that, under *Miranda*, the Fifth Amendment right to counsel does not vest until a defendant is in custody. *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981)

12

("when an accused has invoked his right to have counsel present *during custodial interrogation*, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights"). (Emphasis added.) *See also McNeil v. Wisconsin*, 501 U.S. 171, 182, fn. 3 (1991). (The Supreme Court of the United States stated: "We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.' * * * If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even *prior to identification as a suspect*." (Emphasis added.))

{¶40} Similarly, the June 17, 2011 interview occurred at appellant's apartment. Again, appellant was advised that he was not under arrest, he was free to leave, and he was not required to answer the officers' questions. During the questioning, appellant stated that "maybe he should speak to an attorney." Although the officers attempted to continue to question appellant, he "shut down" and the questioning ceased.

{¶41} On June 21, 2011, the officers again went to appellant's apartment. At this encounter, the officers informed appellant that his DNA was on the knife handle found in Sipes' apartment. The officers informed appellant that he was not under arrest, he was free to leave at any time, and he did not have to answer any questions. The officers then proceeded to show appellant pictures of the knife's handle. Appellant stated he should speak with an attorney. After appellant made this statement, the officers left the apartment. Although the trial court did not enter written findings of fact or conclusions of law with respect to the June 21, 2011 encounter, it appears the court

did not suppress any statements made by appellant to the officers because appellant was not in custody.

{¶42} On June 22, 2011, the officers arrived at appellant's apartment to execute a search warrant. The officers informed appellant that he was free to leave during the execution of the warrant. Appellant, however, chose to remain on the front porch.

{¶43} After reading the pages of the notebook found in appellant's apartment, which contained appellant's confession to the murder of Sipes, the officers confronted appellant. Detective DiJerome approached appellant on the front porch and asked appellant, "is this your notebook?" Appellant responded, "yes." Detective DiJerome then asked appellant, "is this your writing?" Appellant responded, "yes, it is." As we held the reading and seizing of the notebook was unlawful, all statements relating to the notebook are to be suppressed as they are considered "fruits" of the officers' unlawful seizure of the notebook. *Wong Sun v. United States*, 371 U.S. 471, 482 (1963) ("Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence.")

{¶44} After questioning appellant regarding the notebook, Detective DiJerome returned into the apartment to continue his search while appellant remained on the porch with Officer Ennermoser. The record reveals that during his conversations with Officer Ennermoser, appellant requested an attorney and stated that he did not wish to speak. Officer Ennermoser testified that after each break in conversation, she informed appellant that it was his right *not* to speak. Appellant, without prompting by Officer Ennermoser, spoke of his dysfunctional family and his dealings with Sipes. At this

14

point, Detective DiJerome made the statement that appellant may feel better if he just told the truth. Appellant then confessed to killing Sipes.

{¶45} Here, appellant's statements were not prompted by questioning initiated by law enforcement officers. The record reveals no evidence of coercive or overreaching police conduct. Appellant did not make this admission regarding the killing of Sipes in response to any question by the police. Because appellant was not subject to a custodial interrogation on June 22, 2011, he was not subject to *Miranda*. Therefore, other than the statements related to the writing in his journal, appellant's statements should not be suppressed.

{¶46} Appellant's second assignment of error has merit to the extent indicated.

{¶47} Based on our disposition of appellant's first and second assignments of error, we find appellant's third, fourth, and fifth assignments of error, all related to sentencing issues, moot.

{¶48} This case is remanded to the trial court for further proceedings consistent with this opinion. On remand, the trial court must proceed from the point at which the error occurred. *See, e.g., State v. Clark*, 1st Dist. No. C-920603, 1993 Ohio App. LEXIS 4926 (Sept. 8, 1993).

{¶49} Based on the opinion of this court, the judgment of the Portage County Court of Common Pleas is hereby affirmed in part, reversed in part, and remanded.

CYNTHIA WESTCOTT RICE, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

_____

15

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶50} I dissent and would affirm the decision of the trial court, both with respect to the validity of the search warrant and the suppression of Armstrong's confession.

{¶51} "In search and seizure cases where a warrant is involved, the requisite specificity necessary therein usually varies with the nature of the items to be seized." *State v. Benner*, 40 Ohio St.3d 301, 307, 533 N.E.2d 701 (1988). "[T]he key inquiry is whether the warrants could reasonably have described the items more precisely than they did." *Id.*; *State v. Hale*, 2nd Dist. No. 23582, 2010-Ohio-2389, ¶ 71 (a broad description of items to be searched or seized is "valid if it 'is as specific as circumstances and nature of the activity under investigation permit' and enables the searchers to identify what they are authorized to seize") (citations omitted).

{¶52} In the present case, the warrant authorized the search and/or seizure of "[a]ny object or item that may contain biological evidence (blood/DNA), including but not limited to shoes or clothing" and "[k]ey(s) to apartment building located at 933 Lawrence Drive." As the accompanying affidavit makes clear, Armstrong's DNA had been found on the murder weapon at the victim's apartment, and so it would be reasonable to believe that items containing the victim's blood/DNA might be found in Armstrong's apartment. It would be impossible for police officers to specifically identify all possible objects that might carry evidence of the victim's blood/DNA, although the warrant identifies the two most likely sources of such evidence - shoes and clothing.

{¶53} Contrary to the majority's position, neither the law nor the circumstances of the present case demand greater specificity. In *Benner*, the Ohio Supreme Court approved a warrant "authorizing the search of [the defendant's] houses and his truck for

16

'fibers and hairs and other trace evidence for comparison.'" *Benner* at 307. The court acknowledged that the language was "very broad," but concluded that the warrant "placed a meaningful restriction on the executing officers, *viz.*, they could only seize those items that could be sources of fibers and hairs." *Id.* Similarly, in the present case, the officers could only seize items that contained the victim's blood/DNA; items such as furniture or electronically stored data did not come within the warrant's scope.

{¶54} As to the discovery of the notebook, Detective DiJerome testified:

{¶55} During the search, I open a drawer and I found a memo book, and in my experience sometimes people conceal items; keys, money, whatever, in these types of notebooks. I flip open the notebook looking for any biological evidence, maybe something that might have been transferred in there, looking for the key and I see a writing in there about the homicide of Mr. Sipes.

{¶56} Detective DiJerome's testimony, which is not contradicted or impeached, demonstrates the propriety of seizing the notebook as possibly concealing the key to the victim's apartment and/or biological evidence linking Armstrong to the victim. *Compare State v. Mansfield*, 9th Dist. No. 06CA0022-M, 2007-Ohio-333, ¶ 21 (seizure of a notebook was permissible where the warrant "only allowed seizure of '[a]ny type of pornography depicting child pornography, videos, pictures and magazines'").

{¶57} The majority faults Detective DiJerome for not specifying "what type of DNA the notebook may have contained." *Supra* at ¶ 26. Justification for seizure of the notebook does not require testimony specifying what type of DNA Detective DiJerome expected to find. The notebook may have belonged to Sipes or contained a key or

17

some other property from Sipes' apartment, thus linking Armstrong to the murder. The type of DNA the evidence might carry is a matter properly for forensics.

**{¶58}** Once seized, the incriminating contents of the notebook fell under the plain view doctrine. *State v. Williams*, 55 Ohio St.2d 82, 377 N.E.2d 1013 (1978), paragraph one of the syllabus ("[i]n order for evidence to be seized under the plain view exception to the search warrant requirement it must be shown that (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities").

**{¶59}** The majority is perplexed by the necessity of a warrant to seize the notebook as well as an exception to the warrant-requirement to read the notebook. There is no contradiction. The issue is whether the police were lawfully in a position to view the contents of Armstrong's notebook. The search warrant authorized the police to search Armstrong's apartment for DNA evidence linking Armstrong to Sipes' murder and/or a key to Sipes' apartment. Detective DiJerome testified that he examined the notebook looking for biological evidence and/or a key, which, in his experience, may be concealed in such a notebook. While looking for the key, he noticed the writings about Sipes' murder. Since the writings about Sipes' murder did not fall within the warrant's scope, Detective DiJerome could only proceed if, as was the case, the incriminating nature of the writings was apparent.

**{¶60}** Contrary to the majority's position, the plain view doctrine does properly apply in these circumstances.

18

**{¶61}** [The] cases make clear that when conditions justify an agent in examining a ledger, notebook, journal, or similar item, he or she may briefly peruse writing contained therein. *See also United States v. Chesher*, 678 F.2d 1353, 1356-57 n.2 (9th Cir.1982); *United States v. Ochs*, 595 F.2d 1247, 1256-59 & n.8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S. Ct. 435, 62 L. Ed. 2d 328 (1979). The justification may arise from "a 'reasonable suspicion' to believe that the discovered item is evidence," *Wright*, 667 F.2d [793,] 798 (9th Cir.1982)], as in *Hillyard, Wysong*, and *Damitz*; or it may arise from the authority conferred by a warrant to search for certain items which might reasonably be expected to be found within such a book, as here. In either case, the plain view doctrine would permit brief perusal of the book's contents and, consequently, its seizure if such perusal gives the examining agent probable cause to believe that the book constitutes evidence.

**{¶62}** *United States v. Issacs*, 708 F.2d 1365, 1370 (9th Cir.1983); *State v. Sautter*, 6th Dist. No. L-88-324, 1989 Ohio App. LEXIS 3101, *16-17 (Aug. 11, 1989) ("[a] number of courts * * * have upheld * * * the seizure of documents during an otherwise valid search as in 'plain view' notwithstanding the fact that some perusal, generally fairly brief, of the documents was clearly necessary in order for the police to perceive the relevance of the documents to crime") (citation omitted).

**{¶63}** For the foregoing reasons, I respectfully dissent and would affirm the decision of the court below.