[Cite as *State v. Fox*, 2015-Ohio-5523.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-P-0068** |
| JOHN R. FOX, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2014 CR 0057.

Judgment: Affirmed.


*Victor V. Vigluicci,* Portage County Prosecutor, and *Kristina Drnjevich,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*David L. Doughten,* 4403 St. Clair Avenue, Cleveland, OH 44103-1125 (For Defendant-Appellant).


CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, John R. Fox, appeals the judgment of the Portage County Court of Common Pleas denying his motion to suppress evidence, following which he pled no contest to and was convicted of aggravated murder and related offenses. This case involves the use by appellant of Craigslist to lure a male prostitute to his apartment to murder him. At issue is whether the trial court erred in denying appellant's motion to suppress evidence. For the reasons that follow, we affirm.

{¶2} Appellant was charged in a five-count indictment with aggravated murder (with prior calculation and design), an unclassified felony, with two death-penalty specifications (Count 1); aggravated murder (felony murder) with the same specifications (Count 2); aggravated robbery, a felony of the first degree (Count 3); kidnapping, a felony of the first degree (Count 4); and tampering with evidence, a felony of the third degree (Count 5). Appellant pled not guilty.

{¶3} The state dismissed the specifications and the case proceeded as a non-capital case. Subsequently, appellant filed a motion to suppress evidence seized by police from his apartment and all statements made by him while in custody. The trial court held a hearing on the motion over four days. The statement of facts that follows is based on evidence presented at the suppression hearing.

{¶4} Detective Donald Wensel of the Alliance Police Department testified that on December 31, 2013, Ryan Johnston reported that his roommate, Justin Earley, who was 21 years old, had gone missing. He said he had not heard from him since Justin sent him a text message on December 30, 2013, at 9:00 a.m. Ryan said the last time he saw Justin was on December 29, 2013, at 3:00 p.m. Ryan said that Justin is always using his cell phone and on social media and his phone is always charged. Ryan said his phone calls were going straight to Justin's voicemail and he was not responding, and it was completely unlike Justin to not answer his calls and text messages. Ryan provided a photograph of Justin's car, which was a 1992 maroon Buick Riviera. Detective Wensel said that Justin was known to the department to be a male prostitute.

{¶5} Also, on or about December 31, 2013, Shannon Marzano, Justin's close friend, called the department and reported that on December 29, 2013, Justin spent the

night with her in her apartment in Canton.  She said the next morning, December 30, 2013, Justin went to Kent to meet a client he met on the internet to engage in male prostitution.  She said that Justin was supposed to call her when he arrived in Kent and to pick her up from work that evening, but he never did and she had not heard from him since.

{¶6} Detective Wensel said a subpoena was issued to Justin's cell phone provider for the records of Justin's phone usage.  Detective Wensel reviewed the records, which showed that the last outgoing call from Justin's phone was placed on December 30, 2013, at 11:00 a.m., to (330) 541-7383.

{¶7} Detective Wensel said he searched the last number Justin called on Google and it matched a Craigslist ad offering a check-cashing service.

{¶8} Detective Wensel subpoenaed Craigslist for any and all ads posted by anyone using the phone number Justin had called.  Craigslist sent the detective 27 ads that were posted between November 16, 2013 and December 30, 2013 by the same person using that same number.  Some of these ads included a photograph of the person posting them.  Two of the ads caught the detective's attention:  Ad number 26 was posted on December 29, 2013 at 9:00 p.m., the night before Justin went missing, in the "Casual Encounter" section, which is known to law enforcement to be the place where prostitution ads are posted.  The ad stated:  "$$$ good action my place – m4m $$$ looking for all men whose looking right now.  $$$ can get u a lot.  Text (330) 541-7383."  Detective Wensel said that "m4m" means "male for male," and refers to male prostitution.

3

**{¶9}** Ad number 27 was posted on December 30, 2013, the day Justin went missing, at 11:30 a.m. in the "Cars and Trucks for Sale by Owner" section. It was a posting for a maroon 1992 Buick Riviera. The ad included a picture of the car, which was an "exact match" for the photograph of Justin's car provided by his roommate Ryan Johnston. The part of the ad that caught Detective Wensel's attention read: "$1,000 cash *right now* or best offer. Will meet in public place Location: *Kent*." (Emphasis added.) The number that Justin had last called ((330) 541-7383) was given as the contact number, meaning that person, not Justin, was selling Justin's car.

**{¶10}** Detective Wensel caused the e-mail address used in each of the 27 Craigslist ads to be searched. A profile on MyLife.com was located using that e-mail address. It was for a John Fox, 34 years old from Ravenna, with a date of birth of February 3, 1979. A profile picture was also attached, which matched the photograph in the Craigslist ads.

**{¶11}** Detective Wensel researched Fox' criminal history by checking Ohio Law Enforcement Gateway (OHLEG), a website that provides Ohio law enforcement agencies with criminal histories. Detective Wensel found that Fox was previously convicted of aggravated robbery, unlawful sexual conduct with a minor, receiving stolen property, theft of drugs, and escape. He is also a registered sex offender.

**{¶12}** Detective Wensel checked the Portage County Sex Offender Database and found Fox' current address was 1783 E. Main Street, Apartment 7, Kent, Ohio, and his current employer was Seal Master Corporation in Kent.

**{¶13}** Detective Wensel viewed Fox' BMV photograph and found it matched the photograph of the person placing the Craigslist ads and is a photograph of appellant.

4

**{¶14}** On January 16, 2014, Detective Wensel and his partner, Detective Welsh, went to the Kent Police Department and advised Kent Police Detective Soika they were pursuing a missing person investigation and they had a suspect who resided in Kent. Detective Soika advised that the address was actually in Franklin Township, which is in the jurisdiction of the Portage County Sheriff's Office. Detectives Wensel and Welsh then went to appellant's E. Main Street address, which is an apartment complex, in an attempt to make contact with him.

**{¶15}** Upon arrival at Apartment 7, appellant's apartment, which is a free-standing, single-story, cinder-block building, Detectives Wensel and Welsh immediately noticed that, based on the physical surroundings, the picture of Justin's Buick on appellant's Craigslist ad was taken in appellant's parking lot.

**{¶16}** Detective Wensel knocked on the door of Apartment 7, but there was no answer. The detectives then located the apartment manager, Mike Lewis. He gave Detective Wensel appellant's rental agreement, which showed the same name, date of birth, cell phone number, e-mail address, and place of employment as the information provided by OHLEG, MyLife.com, and the sex offender database.

**{¶17}** Detectives Wensel and Welsh searched for Justin's car in appellant's parking lot with negative results.

**{¶18}** The Alliance Detectives then drove to Seal Master. Detective Wensel spoke to the manager Bruce Poitter and said they wanted to talk to appellant. Mr. Poitter said that appellant was not there, but was scheduled to be at work the following morning. Detective Wensel said they would return at that time. After the Alliance

detectives returned to the Alliance Police Department, they put out an all-points bulletin for Justin's car.

**{¶19}** On the following morning, January 17, 2014, before leaving Alliance, Detective Wensel contacted Lt. Greg Johnson of the Portage County Sheriff's Office. Detective Wensel advised he was investigating a missing person from Alliance with ties to Portage County. Detective Wensel said he was going to interview appellant that morning at Seal Master. Lt. Johnson said he would like to attend the interview. He met Detectives Wensel and Welsh in the parking lot of a restaurant near Seal Master. Detective Wensel filled Lt. Johnson in on the results of their investigation. Lt. Johnson instructed two of his detectives to monitor appellant's apartment.

**{¶20}** The Alliance Detectives and Lt. Johnson went to Seal Master at about 10:30 a.m. They contacted the manager, Mr. Poitter, who pulled appellant's recent work records. They showed that appellant failed to show up for work on December 30, 2013 and December 31, 2013, and took two unexcused absences for those days.

**{¶21}** Mr. Poitter escorted Detectives Wensel and Welsh and Lt. Johnson to a conference room where the three officers met with appellant. Detective Wensel read appellant his Miranda rights and appellant signed the waiver form.

**{¶22}** Appellant confirmed his date of birth, address, and cell phone number, which were the same as those provided by OHLEG and the other web sites. Appellant admitted to posting ads on Craigslist, including an ad to provide a check-cashing service and ads to sell various items. He admitted one of these items was a Buick Riviera, which, he said, he posted for someone he knew. He said a male named Justin came to his apartment on December 30, 2013, the day he was off work. He said Justin

6

is a male prostitute. Detective Wensel asked appellant how he knew Justin. Appellant said that Justin was selling a CD player on the internet about one month ago. Appellant said he had a friend who was looking for one so he contacted Justin about it. Appellant said he started talking to Justin after that, and Justin came to visit him at his apartment a total of three times, with the visit on December 30, 2013 being the last. Justin told him he needed money so appellant suggested he sell his car, the 1992 maroon Buick Riviera. Appellant said Justin agreed so appellant took pictures of the car in his parking lot and posted the car for sale on Craigslist, providing appellant's information as the contact person. Appellant did not say why he, rather than Justin, posted the car for sale. Detective Johnson found this suspicious since Justin was constantly on the internet. Appellant only posted the car for sale for two hours and then cancelled the sale. The detective also found this to be suspicious.

{¶23} Appellant said he called Justin during the evening of December 29, 2013, and asked him to come to visit him that night. Justin said he could not come because he was with his parents. Appellant said Justin told him he would come the next morning. Appellant said they texted back and forth. Appellant said he told Justin he would pay him $200 to engage in sex with appellant, but, he said, he was only joking. When asked about it, appellant said he deleted the list of his contacts and his text messages with Justin from his cell phone.

{¶24} Appellant said that, at Justin's request, he moved Justin's car to the apartment complex next door called Campus Pointe because Justin said he knew someone who would watch the car for him. Appellant said Justin did not tell him who would watch the car, where he lived, how he would know to watch the car, or how he

7

would find the car since the parking lot at Campus Pointe was so large. Detective Wensel said none of this made any sense and was suspicious.

{¶25} Based on this information, at about 11:45 a.m., Lt. Johnson instructed the detectives who were watching appellant's apartment to go to Campus Pointe to look for Justin's car while another detective assumed watch of appellant's apartment.

{¶26} Appellant said that at about 8:00 p.m., Justin just walked out of his apartment and appellant had no idea where he went. Appellant said he gave Justin his car keys and a thin hoodie, which, appellant admitted, was inadequate due to the frigid weather. Appellant offered no explanation as to why Justin would walk outside on that cold December night and just leave his car with appellant. Detective Wensel said this made no sense and was suspicious.

{¶27} Appellant told Detective Wensel his phone was on a table in the work area and Detective Welsh retrieved it. Detective Wensel asked appellant if he could look in it and appellant said he could. However, there were only three text messages that had not been deleted and none of them involved Justin.

{¶28} Appellant said he had not had any contact with Justin since he left on December 30, 2013. Detective Wensel asked if they could take a look in his apartment to see if Justin left anything behind, but appellant said not without a warrant. When Detective Wensel asked appellant where exactly in the Campus Pointe parking lot he had left Justin's car, appellant became upset and said he was done "playing this game" with him and terminated the interview. After appellant's interview was concluded, Lt. Johnson received a phone call advising him that Justin's car was found at Campus Pointe.

8

{¶29} Lt. Johnson and the Alliance Detectives left Seal Master at about 12:00 p.m. and went to the Campus Pointe parking lot. They observed Justin's car, which was locked. They then went to the Portage County Sheriff's Office. They reviewed the information they had and determined they had probable cause for a search warrant.

{¶30} Lt. Johnson testified that, with input from the Alliance Detectives and after consulting with the Portage County Prosecutor, he prepared an affidavit for a search warrant for Justin's car, appellant's apartment, and his cell phone. Lt. Johnson listed the evidence he believed was located at appellant's apartment, namely, car keys, car title, cell phones, and trace evidence, including blood, hair, fibers, and DNA. He said that, if found, the evidence would be used in a prosecution for grand theft auto and murder. Lt. Johnson went to the Portage County Municipal Court to obtain a search warrant, and Detective Wensel and Detective Welsh went to the Campus Pointe parking lot to wait for Lt. Johnson to return with the warrant. Lt. Johnson presented the affidavit for a search warrant to Judge Poland and, after Lt. Johnson swore to its accuracy, the Judge issued the warrant. Lt. Johnson had one of his detectives call B.C.I. to ask them to respond to assist in processing the scene. Lt. Johnson and the Alliance detectives proceeded to Campus Pointe.

{¶31} First, the officers executed the search warrant by searching Justin's car at Campus Pointe. Because the car was locked, a lockout tool was used to open the driver's door and trunk. A sweep of the interior and trunk produced no evidence. The officers and BCI team then went to appellant's apartment, which was about 750 feet from where the car was located. The apartment manager provided a key to the detectives and, upon opening the door, the odor of decomposition was detected.

9

**{¶32}** After the apartment was cleared, the Detectives and BCI team found a dead body in the living room closet wrapped in a blanket. The body was in an advanced stage of decomposition. The blanket was covered with a scented white powder. Next to the closet was a box of Arm & Hammer carpet deodorizer, a scented candle, and a spray can of Febreze air freshener. The body was that of Justin Earley.

**{¶33}** When Lt. Johnson returned to the Sheriff's Office, he put out a call to "be on the lookout" for appellant and obtained a warrant for his arrest. At about 6:00 p.m., appellant called Lt. Johnson. Appellant told him he wanted to talk to him. He said he was on Hayes Road in Ravenna Township. Lt. Johnson went to the area, located appellant, and took him to the Sheriff's Office. After Lt. Johnson administered the Miranda warnings, appellant said he had "kind of singled him [Justin] out. I guess in a way I purposely, well, unfortunate for him, but I have a lot of anger in the last year." When asked if he had an idea of what he was going to do when Justin got to his apartment, appellant replied, "yep." He told Lt. Johnson that Justin "died that day" and that he had been in the closet since December 30, 2013. Appellant said he moved Justin's car. He said that Justin was under the impression that he would be paid $200 to have sex with him. Appellant said, "I pretty much just used that against him to, I pretty much told him, I said pull your pants down and turn around or whatever. When he turned around it was over." Appellant said he "choked him out." He said he put him in a head lock. Appellant said that Justin did not die quickly because he put up a fight. Appellant said that after killing Justin, he sat on the couch and smoked. He told Lt. Johnson that "I don't even feel bad." Appellant said that after he moved Justin's car, he threw the keys away in a dumpster. He also took Justin's wallet, which contained his

credit cards. In a subsequent interview on January 21, 2014, after Lt. Johnson again advised him of his Miranda rights, appellant said he had never met Justin before December 30, 2013. Lt. Johnson asked him if the sole purpose for bringing Justin to Kent was to kill him, and appellant said, "Uh-huh. Unfortunately the unlucky one."

{¶34} The trial court denied appellant's motion to suppress. Thereafter, appellant pled no contest to each count of the indictment. After the court found that appellant had voluntarily pled no contest, the court found him guilty of the charges.

{¶35} Subsequently, the court held a sentencing hearing. The court found Counts 1 and 2 (aggravated murder) and 4 (kidnapping) were allied offenses of similar import and merged, and the state elected to proceed to sentencing on Count 1, aggravated murder with prior calculation and design. The court sentenced appellant to life in prison without parole for aggravated murder, 11 years for aggravated robbery, and three years for tampering with evidence, the terms to be served concurrently.

{¶36} Appellant appeals the court's denial of his motion to suppress, asserting two assignments of error. For his first, he alleges:

{¶37} "The trial court erred by overruling the appellant's motion to suppress evidence because of the affidavit accompanying the request failed to establish probable cause that police officials would find evidence of a crime inside the home of the appellant."

{¶38} "Appellate review of a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact." *State v. Lowe*, 11th Dist. Ashtabula No. 2014-A-0010, 2015-Ohio-1064, ¶25. "During a hearing on a motion to suppress evidence, the trial court acts as the trier of fact and, as such, is authorized to resolve

factual questions and assess the credibility of witnesses." *Id.* "An appellate court reviewing a ruling on a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence." *Id.* "Accepting these facts as true, the appellate court independently determines, as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard." *Id.*

{¶39} "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. McDivitt*, 11th Dist. Lake No. 2011-L-129, 2012-Ohio-2243, ¶20, quoting *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983).

{¶40} "In assessing the sufficiency of probable cause in an affidavit which supports a search warrant, neither the lower court nor the appellate court should engage in a de novo review." *McDivitt*, *supra*. "Instead, a reviewing court should merely ensure that the magistrate had a 'substantial basis' for concluding that probable cause existed to issue a warrant." *McDivitt, supra,* quoting *George, supra.* "Thus, great deference must be afforded to the magistrate's finding of probable cause and 'doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.'" *McDivitt, supra*, quoting *George, supra.*

{¶41} Crim.R. 41(C)(1) provides, in pertinent part:

{¶42} A warrant shall issue on * * * an affidavit * * * sworn to before a judge of a court of record * * * establishing the grounds for issuing the warrant. In the case of a search warrant, the affidavit shall [1.] name or describe the person to be searched or particularly describe the place to be searched, [2.] name or describe the property to be searched for and seized, [3.] state substantially the offense in relation thereto, and [4.] state the factual basis for the affiant's belief that such property is there located.

{¶43} Appellant argues Lt. Johnson's affidavit did not comply with the third and fourth requirements for an affidavit for a search warrant.

{¶44} With respect to the third requirement, i.e., the affidavit must substantially state the nature of the offense in relation to the evidence to be seized, appellant provides no argument at all. In fact, appellant concedes that Lt. Johnson in his affidavit stated that the evidence sought "shall be * * * used in a prosecution for the offense of Grand Theft Auto, in violation of ORC 2913.02 a 4th degree felony, and Murder, in violation of ORC 2903.02. This is an unclassified felony." Thus, Lt. Johnson's affidavit substantially stated the offenses at issue.

{¶45} The fourth requirement of an affidavit for search warrant required Lt. Johnson to state the factual basis for his belief that the evidence he sought was located in appellant's apartment. In order to issue the warrant, Judge Poland was required to make a common-sense decision that, in light of the circumstances in the affidavit, there was a fair probability that the noted items of evidence would be found in appellant's apartment. *McDivitt, supra.*

{¶46} Appellant argues Lt. Johnson's affidavit was insufficient because he did not present any evidence of threats, violence, sexual activity, or theft. However, while Lt. Johnson may not have presented any direct evidence of such conduct, circumstantial evidence of each was outlined in his affidavit. This court has repeatedly

13

stated that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value, even when used to prove essential elements of an offense." *State v. Norwood*, 11th Dist. Lake No. 2005-L-047, 2006-Ohio-3415, ¶15.

{¶47} Lt. Johnson's affidavit recounted in detail the results of the investigation of the Alliance Police Department and summarized appellant's first police interview. Specifically, (1) on December 29, 2013, appellant, a registered sex offender and career felon, posted an ad on Craigslist soliciting sex with a male for hire and provided his phone number; (2) on December 30, 2013, at 11:00 a.m., Justin called appellant, which was the last phone call Justin made; (3) appellant said that before Justin arrived at his apartment that day, he told Justin he would have sex with him for $200; (4) appellant said Justin was in his apartment with him all day on December 30, 2013; (5) at 11:30 a.m., appellant listed Justin's car for sale on Craigslist for "$1,000 cash right now"; (6) appellant moved Justin's car to Campus Pointe where the detectives later found it; (7) according to appellant, Justin simply walked out of his apartment into the night in the middle of winter leaving his car behind; (8) the last place Justin was known to be was in appellant's apartment; (9) Justin was missing for 18 days; and (10) Justin was known to always be on social media and he was not on social media after December 30, 2013.

{¶48} The foregoing circumstances as outlined in Lt. Johnson's affidavit demonstrated there was a fair probability that evidence of criminal activity would be found in appellant's apartment.

{¶49} Appellant's first assignment of error is overruled.

{¶50} For his second and final assignment of error, appellant contends:

14

{¶51} "The trial court erred by failing to suppression [sic] the evidence based upon the entry into the appellant's residence prior to the obtaining [sic] of a search warrant."

{¶52} Appellant argues that law enforcement entered appellant's apartment before the search warrant was issued. However, there is no evidence that any law enforcement officer ever entered appellant's apartment before the warrant was issued.

{¶53} Lt. Johnson testified that before preparing the affidavit and search warrant, to his knowledge, no police officer entered appellant's apartment. He said that he did not authorize anyone to enter the apartment before getting the warrant; that he did not enter the apartment before getting the warrant; and that no one told him they had entered the apartment before he got the warrant. Appellant argues this testimony was not credible. However, that determination was solely for the trial court, which was entitled to find, as it obviously did, that this testimony was credible. The trial court could also consider that, as appellant concedes, no witness testified they entered the apartment before Lt. Johnson arrived with the warrant.

{¶54} Appellant argues that because there was no direct evidence of violence, Lt. Johnson's statement in his affidavit that any evidence found in the apartment would be used in a prosecution for murder "suggests" a prior entry into the apartment without a warrant. However, Lt. Johnson testified the following circumstances outlined in his affidavit substantiated charges of grand theft auto and murder: Justin was a missing person from Alliance who had been missing for an extended period; his last contact was with appellant, who had advertised for sex with a male the day before Jason went missing; appellant has a criminal history including robbery; appellant admitted he had

15

contact with Justin the day he went missing, appellant was trying to sell a car that does not belong to him; and Justin's car was found close to where appellant lives. Thus, Lt. Johnson's reference to grand theft auto and murder in his affidavit did not rely on a police entry into appellant's apartment before the warrant was issued. Further, appellant's argument regarding cadaver dogs that were used the night before by Detective Wensel with negative results misconstrues the evidence because the incident involving the dogs to which the detective referred occurred *several months earlier* when he was investigating *another case* in Portage County, not this case.

{¶55} Thus, contrary to appellant's argument, Lt. Johnson's reference to murder in his affidavit was based on the circumstances known to him at the time and had nothing to do with an entry by police into appellant's apartment before the warrant was issued. Significantly, there is no mention in the affidavit of a body, the odor of decomposition, or anything else that could only have been discovered upon entering the apartment before the warrant was issued. Thus, we agree with the trial court's finding that Lt. Johnson's reference to murder in his affidavit did not taint the warrant.

{¶56} Appellant's second assignment of error is overruled.

{¶57} For the reasons stated in this opinion, the assignments of error lack merit and are denied. It is the order and judgment of this court that the judgment of the Portage County Court of Common Pleas is affirmed.


THOMAS R. WRIGHT, J., concurs,

TIMOTHY P. CANNON, P.J., concurs in part and concurs in judgment only in part, with a Concurring Opinion.

_____

16

TIMOTHY P. CANNON, P.J., concurring in part and concurring in judgment only in part.

{¶58} I agree with the majority regarding appellant's second assignment of error. I concur in judgment only with the first assignment of error, as I have issues with the search warrant for appellant's apartment.

{¶59} "A search warrant should not give an officer carte blanche authority to search appellant's apartment. The items to be located and seized pursuant to a search warrant must be identified with sufficient particularity." *State v. Armstrong*, 11th Dist. Portage No. 2012-P-0018, 2013-Ohio-2618, ¶26. Here, the warrant stated the property to be searched for and seized included "trace evidence including but not limited to blood, hair, fibers, DNA." "It is fairly common knowledge that DNA is prevalent; it is microscopic. This broad permission, without any stated probable cause that would lead one to believe some particular bit of DNA was present, may have given the officers impermissibly broad authority to conduct this search." *Id.* at ¶25. The language of the warrant, therefore, was overbroad.

{¶60} Further, the officer's affidavit did not provide probable cause to believe a murder had taken place. However, because the affidavit did provide probable cause to believe a theft of the victim's auto had occurred, the officers did have authority to enter appellant's apartment pursuant to this warrant. Once inside, they smelled a decomposing body. As a result, any search that went beyond the scope of a warrant for theft of the auto was permissible under the "plain smell" doctrine. *See State v. Moore*, 90 Ohio St.3d 47, 51 (2000) (recognizing the "plain smell" doctrine as a corollary to the

"plain view" doctrine); *see also State v. Glenn*, 11th Dist. Lake No. 2015-L-029, 2015-Ohio-4832 (following *Moore*).